EDWARDS, Appellee,

v.

OHIO INSTITUTE OF CARDIAC CARE et al., Appellants.

[Cite as *Edwards v. Ohio Inst. of Cardiac Care*, 170 Ohio App.3d 619, 2007-Ohio-1333.]

Court of Appeals of Ohio,<br/>Second District, Greene County.

No. 2006 CA 74.

Decided March 23, 2007.

620

622

Don Brezine and Mark Jeffrey Babb, for appellee.

Paul H. Shaneyfelt, for appellants.

WOLFF, Presiding Judge.

{¶ 1} Ohio Institute of Cardiac Care ("OICC") appeals from a judgment of the Greene County Court of Common Pleas, after a jury trial, in favor of Kathy Edwards on her sexual-harassment claim.

{¶ 2} According to Edwards's evidence at trial, in late 2002, Edwards learned of a position at OICC from her babysitter, whose sister, Chantil Caskey, worked at OICC. Edwards interviewed, was hired, and began working as a scheduler at OICC's First Street office in Springfield on December 19, 2002. According to OICC's organizational chart, Dr. Salim Dahdah ("Dr. Dahdah") was OICC's president. Cindy Dahdah ("Dahdah") was next in line as the executive vice president. James Webster was the operations manager, who supervised all of the office managers at OICC's various locations. In December 2002, David Brandenburg was the office manager for the First Street office, and he was Edwards's immediate supervisor. In approximately February 2003, Brandenburg left OICC and Webster assumed the office manager duties for the First Street office until approximately May 2003, when Jeff Bumgardner was hired as the office manager.

{¶ 3} In mid-March 2003, Webster began to send personal e-mails (akin to instant messages) to Edwards. In his messages, he asked Edwards whether she was married, how many children she had, whether she had ever had an affair, and the like. Edwards stated that the personal questions made her feel very uncomfortable and nervous, and she tried to figure out how to avoid the questions and not answer them.

{¶ 4} Edwards informed Caskey, the Clinical Department Head of the Pacemaker Clinic, about Webster's messages. Caskey responded: "It's happened before. This is not the first time and it won't be the last." Caskey told Edwards that Webster's next move would be to invite her out for a drink. Edwards asked, "What do I need to do?" Caskey said, "At this point, I wouldn't upset him, I'll tell you that." Caskey then asked Edwards, "Do you want me to go to my manager in Dayton, Glenda Burns, and talk to her about it?" Edwards responded, "Let's give it a few days and see if he goes away."

{¶ 5} Within a few days of Edwards's conversation with Caskey, Webster invited Edwards for a drink. Edwards returned to Caskey and asked for her help. Edwards suggested printing out a message and going to Cindy Dahdah. Caskey responded, "Not if you want to keep your job. That's her right-hand man."

{¶ 6} Initially, Edwards received six to ten personal messages from Webster each day. Gradually, the messages became more personal, such as asking Edwards if she had ever performed oral sex, did she date often, and what type of

men she preferred. In addition, whenever Webster stopped at her desk, he would touch her lower back, the top of her buttocks, and her shoulders. The frequency of the messages continued to increase. Edwards indicated that at one point, she was receiving 15 to 20 messages each day. Later, she received 20 to 30 messages.

{¶ 7} Edwards indicated that she did not tell anyone other than Caskey because Caskey had stated: "Stay in contact with me and keep your mouth shut to everybody else about it [the situation with Webster] at this time." Edwards believed that Caskey would resolve the situation.

{¶ 8} Eventually, Edwards decided to print one e-mail and to talk with Cindy Dahdah. She printed a message from Webster that asked Edwards what color her bra and panties were that day. When Edwards went to retrieve the message from the printer, which was not near her desk, the message was gone.

{¶ 9} The following day, Webster e-mailed Edwards, asking why she would print the e-mail and informing her that Dahdah had it. Caskey told Edwards that Dahdah had the e-mail and that she was "hot." Caskey also said that she was worried for Edwards's job. A couple of days later, Webster e-mailed Edwards and told her that Dahdah would make him fire her and that Edwards should be concerned about her job. Other employees began whispering when she walked by and rumors about a relationship between Edwards and Webster were circulating.

{¶ 10} According to Edwards, after the e-mail came to light, she began to receive tardy forms. On July 7, 2003, Edwards was discharged, ostensibly for changing her clothes at the end of the day prior to the Fourth of July weekend. Edwards indicated that she was terminated by Bumgardner, her supervisor, but she believed that Dahdah made the decision to fire her. Edwards had no evidence that Webster had her employment terminated.

{¶ 11} During OICC's case-in-chief, Bumgardner testified that he made the decision to fire Edwards based on his belief that she had violated the dress code while she was on the clock, while patients were still in the building, and when such conduct violated OSHA regulations. Bumgardner indicated that he called Dahdah and informed her of his recommendation to fire Edwards. Dahdah responded: "Jeff, that's your office. Do you feel like this is appropriate? If you feel it's appropriate, I will support you." Bumgardner testified that he was not aware of the sexual-harassment allegations against Webster at the time of Edwards's termination, and Webster was not involved in the decision to fire her.

{¶ 12} In contrast to Edwards's testimony, Caskey testified that Edwards never told her that Webster was sexually harassing her and never asked her for assistance. Webster testified that he recalled sending an e-mail regarding

Edwards's underwear but that Edwards was an active participant in the flirtation. Webster also denied sending other e-mails of a sexual nature. Webster also stated that he had never threatened Edwards with employment ramifications if she did not see him outside the office. Caskey, Brandenburg, and Bumgardner each testified that Edwards was not a punctual employee.

{¶ 13} On August 3, 2004, Edwards brought suit against OICC, Dr. Dahdah, and Webster, alleging sexual harassment, retaliation, and assault and battery. On February 2, 2005, Dr. Dahdah was dismissed from the litigation, pursuant to Civ.R. 12(B)(6). During mediation, Edwards reached a settlement with Webster, and on October 5, 2005, he was dismissed by an agreed entry. In December 2005, Edwards proceeded to trial against OICC on her sexual harassment and retaliation claims.

{¶ 14} After hearing the evidence, the jury found in favor of Edwards on her sexual-harassment claim but found in favor of OICC on her retaliation claim. In the interrogatories, the jury concluded that Webster was Edwards's supervisor and that Edwards had been subjected to a hostile work environment. The jury awarded Edwards $200,000 in compensatory damages.

{¶ 15} On December 21, 2005, OICC filed a motion for judgment notwithstanding the verdict ("JNOV") or, alternatively, for a new trial or remittitur. OICC asserted that it could not be liable due to the release of Webster from liability, that the damage award was excessive and against the manifest weight of the evidence, that the court erred in not providing a jury instruction on the affirmative defense to the sexual-harassment claim, and that Edwards's counsel made improper statements during closing argument. The trial court denied the motion on May 10, 2006.

{¶ 16} OICC appeals, raising five assignments of error.

{¶ 17} I. "The trial court committed reversible error by making the factual determination that a tangible employment action was taken against appellee and failing to instruct the jury of OICC's affirmative defense."

{¶ 18} In its first assignment of error, OICC claims that it was entitled to an instruction on an employer's affirmative defense to liability for sexual harassment by a supervisor. It further claims that the trial court erred in failing to give that instruction based on its erroneous conclusion that Edwards had suffered a tangible employment action as a result of the alleged sexual harassment.

{¶ 19} The Supreme Court of Ohio has recognized two types of sexual-harassment claims: (1) "quid pro quo" harassment, i.e., harassment that is directly linked to the grant or denial of a tangible economic benefit, and (2) "hostile environment" harassment, i.e., harassment that while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working

environment. *Hampel v. Food Ingredients Specialties, Inc.* (2000), 89 Ohio St.3d 169, 176, 729 N.E.2d 726.

{¶ 20} When the alleged harasser is a supervisor, the employer's liability depends on the consequences of the supervisor's harassing conduct. See *Harmon v. GZK, Inc.* (Feb. 8, 2002), Montgomery App. No. 18672, 2002 WL 191598. If the sexual harassment resulted in a tangible employment action, the employer will be strictly liable for the supervisor's sexual harassment. *Faragher v. Boca Raton* (1998), 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Burlington Indus., Inc. v. Ellerth* (1998), 524 U.S. 742, 762–763, 118 S.Ct. 2257, 141 L.Ed.2d 633. A tangible employment action means "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257, 141 L.Ed.2d 633. "[A]n employment action must be materially adverse for an employer to be strictly liable for sexual harassment." *Keeton v. Flying J, Inc.* (C.A.6, 2005), 429 F.3d 259, 262–263; *Kocsis v. Multi–Care Mgmt. Inc.* (C.A.6, 1996), 97 F.3d 876, 886.

{¶ 21} If the sexual harassment by the supervisor did not result in a tangible employment action, then the employer may assert an affirmative defense. The employer may avoid liability if it can establish, by a preponderance of the evidence, (a) that it exercised reasonable care to prevent and to correct promptly any sexually-harassing behavior and (b) that the plaintiff unreasonably failed to utilize the measures the employer provided or to avoid harm otherwise. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633.

{¶ 22} Prior to closing argument, OICC objected to the lack of an instruction on the *Faragher/Ellerth* employer affirmative defense, which is articulated in 2 Ohio Jury Instructions (2003) Section 266.19(6). The trial court overruled the objection, stating:

{¶ 23} "The Court has reviewed the Jury instructions regarding this matter and noting the case of *Faragher v. City of Boca Raton*, a United States Supreme Court case decided in 1998, there's a reference to the fact that an affirmative defense would be appropriate if no tangible employment action such as discharge took place. Since that is the essence of the claim of the Plaintiff in this matter, I believe that conduct has application, and the Court will not give that instruction."

{¶ 24} In our view, the trial court has misconstrued when the affirmative defense applies. In *Faragher* and *Ellerth*, the United States Supreme Court focused on whether an employer may be held vicariously liable when a supervisor creates a hostile work environment. In both cases, the court supported holding an employer vicariously liable for a supervisor's harassing conduct by reference

to the aided-by-agency-relation principle, as set forth in Restatement of the Law 2d, Agency (1958) 481, Section 219(2)(d). *Faragher,* 524 U.S. at 802, 118 S.Ct. 2275, 141 L.Ed.2d 662; *Ellerth,* 524 U.S. at 760–763, 118 S.Ct. 2257, 141 L.Ed.2d 633. The court had no difficulty holding an employer liable for the acts of a harassing supervisor when a tangible employment action had been taken by the supervisor. See *Ellerth,* 524 U.S. at 761–763, 118 S.Ct. 2257, 141 L.Ed.2d 633. "Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control." Id. at 762, 118 S.Ct. 2257, 141 L.Ed.2d 633. As stated by Justice Thomas in his *Ellerth* dissent, if a supervisor takes an adverse employment action, causing a tangible job detriment, the employer is responsible for the resulting damages "because such actions are company acts that can be performed only by the exercise of specific authority granted by the employer, and thus the supervisor acts as the employer." Id. at 768, 118 S.Ct. 2257, 141 L.Ed.2d 633.

{¶ 25} Under *Faragher* and *Ellerth,* an employer is strictly liable for sexual harassment by the supervisor—and the affirmative defense is unavailable—when *that supervisor* has taken a tangible employment action against the aggrieved employee. A classic example is where a supervisor demotes an employee who rebuffs the supervisor's sexual advances. It is not sufficient that a tangible employment action ultimately occurs; the tangible employment action must be directly linked to the harassment.

{¶ 26} Based on the evidence presented by Edwards at trial, we agree with OICC that Edwards did not establish a tangible employment action such that OICC would be precluded from requesting the affirmative-defense instruction. Although Edwards was ultimately terminated, there is no evidence that Webster made the decision to fire her, orchestrated her termination, or participated in any way in the decision to fire her. Edwards admitted that she had no evidence that Webster had her employment terminated, and Bumgardner testified that he made the decision without input from Webster and without knowledge of the sexual-harassment charges against him. Accordingly, although Edwards's testimony provided sufficient evidence that Webster had sexually harassed her, there was no evidence that his harassment culminated in a tangible employment action. OICC was thus entitled to the affirmative-defense instruction.

{¶ 27} Edwards claims that the trial court's ruling was nevertheless correct for several reasons. First, Edwards argues, citing *Hampel,* that the Supreme Court of Ohio has not adopted the employer affirmative defense as set forth by the United States Supreme Court. Edwards acknowledges, however, that we previ-

ously adopted the federal case law regarding the employer affirmative defense. *Harmon,* Montgomery App. No. 18672, 2002 WL 191598.

{¶ 28} *Hampel* is silent on the employer affirmative defense. This may be because the Supreme Court concluded that the employer was entitled to judgment notwithstanding the verdict on the sexual-harassment claim and, consequently, a discussion of the affirmative defense was unnecessary. In setting forth the elements of a hostile-environment sexual-harassment claim, however, the Supreme Court of Ohio has followed federal authority regarding Title VII. See, e.g., *Hampel,* 89 Ohio St.3d at 175, 729 N.E.2d 726 (noting that federal case law regarding Title VII is generally applicable to cases involving R.C. Chapter 4112). We see no reason why the Supreme Court of Ohio would not adopt the employer affirmative defense should the issue come before it.

{¶ 29} Second, Edwards argues that although OICC objected to the lack of an affirmative-defense instruction, it failed to object to the lack of an instruction on a tangible employment action. Edwards thus contends that OICC either conceded that a tangible employment action occurred or waived the right to assert the affirmative defense "by failing to give it proper context."

{¶ 30} Upon review of the record, OICC did not concede that a tangible employment action occurred, nor did it waive its objection to the lack of an affirmative-defense instruction. Although the United States Supreme Court in *Faragher* and *Ellerth* downplayed the use of the terms "quid-pro-quo" and "hostile work environment" in its analysis of employer liability, those terms have generally been used to demarcate whether a tangible employment action has occurred. In general, quid pro quo claims involve tangible employment actions while hostile-work-environment claims involve severe and pervasive harassment that did not culminate in a job detriment. As stated above, the Supreme Court of Ohio has separated sexual-harassment claims into these two categories.

{¶ 31} In general, the trial court's instructions regarding Edwards's sexual-harassment claim mirrored 2 Ohio Jury Instructions Section 266.19, which addresses hostile-work-environment sexual-harassment claims. For example, the court initially set forth the claim, stating:

{¶ 32} "Claim for sexual harassment. Kathy Edwards claims that she has been subjected to a hostile work environment as a result of being sexually harassed. To establish a claim of hostile work environment, Kathy Edwards must prove by the greater weight of the evidence that she was sexually harassed and the sexual harassment was so severe, pervasive or extensive that it permeated the work environment and altered the conditions of her employment.

{¶ 33} "Unwelcome sexual harassment includes sexual advances, requests for sexual favors, sexual violence, or verbal sexual abuse. Sexual conduct is unwel-

come when it's unsolicited or uninvited by the Plaintiff. Sexual harassment can be by physical contact, work, phone or e-mail.

{¶ 34} "Sexual harassment means unwelcome sexual advances, unwelcome requests for sexual favors, or other unwelcome verbal or physical conduct of a sexual nature." See Ohio Jury Instructions Section 266.19(1) and (2).

{¶ 35} The court instructed the jury on the factors it may consider in determining whether the alleged sexual harassment created a hostile work environment, 2 Ohio Jury Instructions Section 266.19(3), and it informed the jury of the reasonable person standard, 2 Ohio Jury Instructions Section 266.19(4).

{¶ 36} In sum, the trial court's instructions assumed a hostile-work-environment claim in which no tangible employment action was taken. The court did not instruct the jury on sexual harassment that results in a tangible employment action, as set forth in 2 Ohio Jury Instructions Section 266.17. Although Edwards had requested an instruction on tangible employment actions, neither party objected to its exclusion by the trial court. Based on the instructions as presented by the court, in which the only apparent basis for the sexual-harassment claim was a hostile work environment, OICC reasonably objected to the lack of an instruction on the employer affirmative defense as set forth in *Faragher, Ellerth,* and Ohio Jury Instructions Section 266.19(6). If Edwards wished the court to instruct the jury on quid pro quo sexual harassment, for which OICC could be held strictly liable, Edwards should have objected to the lack of such an instruction.

{¶ 37} Parenthetically, we note that the instruction for an employer's liability for a supervisor's harassing conduct is stated only in Ohio Jury Instructions Section 266.17(6), which concerns sexual-harassment claims with tangible employment actions. It is not referenced in Ohio Jury Instructions Section 266.19. Ohio Jury Instructions Section 266.19 thus seems to ignore the liability of an employer for hostile-work-environment sexual harassment by a supervisor. As a result, the affirmative-defense instruction in Ohio Jury Instructions Section 266.19(6) appears disconnected to the other instructions in Section 266.19. Although the comment to Ohio Jury Instruction Sections 266.19(6) states that this defense "applies only to cases in which no tangible employment action, such as discharge, demotion, or undesirable reassignment, occurs," it does not explicitly state that it applies to supervisors, as only supervisors can take tangible employment actions. To avoid unnecessary confusion, we suggest that this oversight be corrected.

{¶ 38} Third, Edwards argues that even if the trial court erred in failing to give the affirmative-defense instruction, OICC was not prejudiced because it did not present sufficient evidence to satisfy the elements of the affirmative

defense. Edwards argues that there was no evidence that Edwards received a copy of OICC's sexual-harassment policy and that the OICC employee handbook's definition of harassment does not include sexual harassment. Edwards further argues that OICC did not meet its burden of proving that Edwards unreasonably failed to avail herself of corrective measures.

{¶ 39} "Under the first prong of the defense, employers 'have an affirmative duty to prevent sexual harassment by supervisors.' * * * While the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there. Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior." *Clark v. United Parcel Serv., Inc.* (C.A.6, 2005), 400 F.3d 341, 349. In other words, the employer must demonstrate "that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment." *Pennsylvania State Police v. Suders* (2004), 542 U.S. 129, 134, 124 S.Ct. 2342, 159 L.Ed.2d 204.

{¶ 40} Bumgardner testified that OICC had an employee handbook, which contained a sexual-harassment provision. The OICC sexual-harassment policy, dated February 2003, was admitted into evidence as Edwards's Exhibit 16 and in OICC's Exhibit B. The policy stated:

{¶ 41} "Sexual harassment of one employee by another employee, supervisor or third party is against practice policy and is unlawful under state and federal law.

{¶ 42} "We firmly prohibit sexual harassment of any employee by another employee, supervisor or third party. Harassment of third parties by our employees is also prohibited. The purpose of this policy is not to regulate the morality of employees. It is to assure that in the workplace, no employee is subject to sexual harassment. While it is not easy to define precisely what sexual harassment is, it includes: unwelcome sexual advances, requests for sexual favors and/or verbal or physical conduct of a sexual nature including, but not limited to: sexually-related drawings, pictures, jokes, teasing, uninvited touching or other sexually-related comments.

{¶ 43} "Any employee who feels that (s)he is a victim of sexual harassment should immediately report such actions in accordance with the following procedure. All complaints will be promptly and thoroughly investigated.

{¶ 44} "1. Any employee who believes that (s)he is a victim of sexual harassment or retaliated against for complaining of sexual harassment, should report the act immediately to the operations manager. If you prefer not to discuss the matter with operations manager, you may contact any other member of management.

{¶ 45} "2. The practice will investigate every reported incident immediately. Any employee, supervisor or agent of the practice who has been found to have violated this policy may be subject to appropriate disciplinary action, up to and including immediate discharge.

{¶ 46} "3. The practice will conduct all investigations in a discreet manner. The practice recognizes that every investigation requires a determination based on all the facts in the matter. We also recognize the serious impact a false accusation can have. We trust that employees will continue to act responsibly.

{¶ 47} "4. The reporting employee and any employee participating in any investigation under this policy have the practice's assurance that no reprisals will be taken as a result of a sexual harassment complaint. It is our policy to encourage discussion of the matter, to help protect others from being subjected to similar inappropriate behavior."

{¶ 48} We note that the parties' appellate briefs quote OICC's general anti-harassment policy (which prohibits harassment on the basis of veteran status, race, color, religion, sex, national origin, age, and physical or mental disability) rather than the sexual-harassment policy. Both are included in the employee handbook. We find the parties' reference to the general antiharassment policy unnecessary and puzzling.

{¶ 49} In our view, the employee handbook's sexual-harassment policy was sufficient to create an issue of fact for the jury as to whether the policy was reasonably designed to prevent sexual harassment and to inform employees of the complaint procedures. Moreover, because there was evidence that Webster received a written reprimand for his conduct and the harassing conduct mostly ceased after Edwards spoke with Dahdah, there is evidence that OICC's sexual-harassment policy was effective.

{¶ 50} Edwards asserts that OICC presented no evidence that she received a copy of the employee handbook. Indeed, Bumgardner testified that on June 24, 2003, there was a meeting with all OICC employees, during which "one of the main topics * * * was to go over our employee handbook from cover to cover." All employees, including Edwards, signed a form acknowledging receipt of the handbook at this time. However, there was no evidence by OICC that the policy was disseminated prior to that meeting. OICC responds that the existence of a written policy is irrelevant given the Supreme Court's statement that "proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law," *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633. OICC also states in a footnote that "[t]he trial court had stated during in chamber discussions that he would not permit OICC's suggested jury instruction regarding its affirmative defense prior [to] OICC's case in chief, and OICC would have presented additional evidence in

support of its defense if the trial court would have given the proper jury instruction."

{¶ 51} Although OICC did not present evidence that it either had disseminated a written sexual-harassment policy prior to the alleged harassment or that it informally exercised reasonable care to prevent the harassment, Edwards herself offered into evidence two versions of an OICC sexual-harassment policy—the policy contained in the employee handbook and a policy that appears to predate the February 2003 version. The prior version, which discusses sexual and other unlawful harassment, prohibits sexual harassment, informs employees to report incidents to their supervisor, to David Andrick, or to any other member of management, and assures employees that they can raise complaints without fear of reprisal and that complaints will be handled "in a timely and confidential manner." The policy also states that anyone engaging in sexual or other harassment will be subject to disciplinary action up to and including termination of employment. In light of Edwards's evidence of OICC's sexual-harassment policies, a reasonable jury could conclude that OICC had a sexual-harassment policy during Edwards's employment, that she was aware of the policy, and that it was effective.

{¶ 52} As to the second prong of the affirmative defense (i.e., whether Edwards unreasonably failed to utilize the measures provided by OICC), OICC presented sufficient evidence to raise a question of fact as to whether Edwards unreasonably failed to take steps to stop the harassment. Caskey denied that Edwards came to her with complaints of sexual harassment and that Edwards had asked for her assistance. Caskey also described Dahdah as "the easiest person in the world to ask for anything," thus refuting Edwards's contention that Dahdah was not approachable. Edwards acknowledged that she did not go to Bumgardner with her complaints. Although Edwards provided evidence that she sought help from Caskey, that she was cautioned not to approach Dahdah, and that she was not warmly received by Bumgardner, OICC's evidence would have been sufficient to raise an issue of fact as to whether Edwards unreasonably failed to avail herself of corrective measures.

{¶ 53} Because OICC was entitled to the jury instruction on the affirmative defense of employer liability for a supervisor's harassment and because there was sufficient evidence from which a jury could find in OICC's favor on that defense, the first assignment of error is sustained.

{¶ 54} II. "The trial court erred in failing to grant OICC's JNOV motion based on appellee's release [of] Jim Webster."

{¶ 55} In its second assignment of error, OICC argues that the trial court should have granted its motion for judgment notwithstanding the verdict,

because Edwards settled with Webster, thus extinguishing the company's liability. OICC's argument is based on basic principles of vicarious liability. Under agency law, an agent is primarily liable for wrongdoing by the agent and the employer is secondarily liable. Consequently, if the employee-agent is found not to be liable, there is no claim against the employer based on the employee's actions.

{¶ 56} The trial court denied OICC's motion, relying on the Supreme Court of Ohio's holding in *Genaro v. Cent. Transport, Inc.* (1999), 84 Ohio St.3d 293, 703 N.E.2d 782, that supervisors may be held jointly and severally liable with their employer. The trial court stated: "The Court is of the opinion that OICC cannot now simply apply the principles of vicarious liability in order to obtain a JNOV."

{¶ 57} Initially, we note that this issue appears to be one of first impression in this state.

{¶ 58} OICC's argument stems from the United States Supreme Court's articulation of an employer's liability for sexual harassment by a supervisor. As stated above, the United States Supreme Court has indicated that once an employee has set forth a claim for sexual harassment, the employer is *vicariously liable* unless it can establish the two elements of an affirmative defense. Based on that authority, we have stated:

{¶ 59} "When the alleged harasser is a supervisor, the employer may be vicariously liable for the supervisor's conduct in creating the hostile work environment. Vicarious liability is a form of indirect legal responsibility that operates to make a principal liable for the acts of its agents. However, the employer confronted with that claim may avail itself of the *Ellerth/Faragher* affirmative defense to vicarious liability for a supervisor's conduct." *Harmon,* Montgomery App. No. 18672.

{¶ 60} As noted by OICC, the general rule is that a principal is secondarily liable for the actions of its agent. The Supreme Court of Ohio has thus made clear that when an agent's liability has been extinguished—either through a release or by judgment—there can be no claim against the principal. *Comer v. Risko,* 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712. The *Comer* court relied on several appellate cases to illustrate the point:

{¶ 61} "An example is *Radcliffe v. Mercy Hosp. Anderson* (May 14, 1997), Hamilton App. Nos. C–960424 and 960425, 1997 WL 249436, a wrongful-death case filed against Mercy Hospital and two physicians, both independent contractors who had treated the plaintiff at Mercy. The plaintiff settled her claim against the first physician, and the court granted summary judgment in favor of the second physician. The court, in turn, granted summary judgment to the hospital on the issue of its liability for the alleged negligence of the independent-

contractor physicians. The court concluded that once the primary liability was extinguished, either by settlement and release or by a favorable judgment, the secondary liability was necessarily extinguished also. Id., citing *Losito v. Kruse* [ (1940), 136 Ohio St. 183, 16 O.O. 185, 24 N.E.2d 705]. '[T]here can be no vicarious liability imputed to a principal, if there is no liability on the part of the agent.' Id.

{¶ 62} "In *Wells v. Spirit Fabricating, Ltd.* (1996), 113 Ohio App.3d 282, 680 N.E.2d 1046, the appellate court concluded that the plaintiff's settlement with and release of the employee/defendant also released the employer. An 'employer cannot be found to be liable for negligence he did not commit. The employer's liability is dependent on the negligence of the employee. Since the plaintiff released [the employee] for his negligence, there is no basis to support plaintiff's claim against Spirit [the employer].' Id. at 294, 680 N.E.2d 1046.

{¶ 63} "Likewise, in *Dickerson v. Yetsko* (Nov. 22, 2000), Cuyahoga App. No. 77636, 2000 WL 1739298, the plaintiff settled with and executed a release to Dr. Yetsko. The court held that the release extinguished the secondary liability of Meridia Hospital because the hospital's liability, if any, was secondary to and derived solely from the primary liability of its agent. If the liability of the primarily liable party was extinguished, the liability of the secondarily liable party was likewise extinguished. Id." *Comer* at ¶ 21–23.

{¶ 64} In light of this precedent, OICC's argument would, at first blush, appear to be persuasive.

{¶ 65} Citing *Genaro*, Edwards responds that OICC's argument disregards the fact that a supervisor may be held liable for violations of R.C. Chapter 4112 because he meets the definition of an employer. R.C. 4112.01(A)(2). As did the trial court, we agree with Edwards.

{¶ 66} We begin with a discussion of the basis for imposing vicarious liability upon employers for the acts of harassing supervisors who create a hostile work environment.

{¶ 67} In *Ellerth* and *Faragher*, the United States Supreme Court focused on whether an employer may be held vicariously liable when a supervisor creates a hostile work environment. Although the court had no difficulty holding an employer liable for the acts of a supervisor when a tangible employment action had occurred, the Supreme Court found it difficult to articulate how agency principles were to be applied when a hostile work environment was created. It noted that it must "accommodate the agency principles of vicarious liability for harm caused by the misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees." *Ellerth*, 524 U.S. at 764, 118 S.Ct. 2257, 141 L.Ed.2d 633.

The Supreme Court had previously noted that "common-law principles may not be transferable in all their particulars to Title VII." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49.

{¶ 68} Likewise, we cannot divorce the application of vicarious liability from the statutory framework of R.C. Chapter 4112. In this respect, we focus not on the basis for the company-employer's liability, but on the basis for the supervisor's liability. R.C. 4112.02 provides that "[i]t shall be an unlawful discriminatory practice: (A) [f]or any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person * * * to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." An "employer" includes "any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer." R.C. 4112.01(A)(2).

{¶ 69} In *Genaro*, the Supreme Court of Ohio held that the "R.C. 4112.01(A)(2) definition of 'employer' * * * encompasses individual supervisors and managers whose conduct violates the provisions of R.C. Chapter 4112." *Genaro*, 84 Ohio St.3d at 296, 703 N.E.2d 782. Thus, the Supreme Court held: "For purposes of R.C. Chapter 4112, a supervisor/manager may be held jointly and/or severally liable with her/his employer for discriminatory conduct of the supervisor/manager in violation of R.C. Chapter 4112." Id. at syllabus.

{¶ 70} In this regard, R.C. Chapter 4112 differs from Title VII. It is well established that individuals, including supervisors, do not fall within the definition of an "employer" under Title VII and, therefore, supervisors may not be held individually liable for their discriminatory conduct. E.g., *Wathen v. Gen. Elec. Co.* (C.A.6, 1997), 115 F.3d 400; *Mandell v. Cty. of Suffolk* (C.A.2, 2003) 316 F.3d 368; *Williams v. Banning* (C.A.7, 1995), 72 F.3d 552. Consequently, unlike the situation before us involving R.C. Chapter 4112, an aggrieved employee would find no occasion to settle a Title VII sexual-harassment claim against a supervisor, as the supervisor would be entitled to dismissal of that claim.

{¶ 71} Under the framework of R.C. Chapter 4112, the liability of the supervisor is not based on his status as an agent of the company. Rather, a supervisor is liable because he, like the company for which he works, meets the statutory definition of an employer. This is reflected in the fact that a co-worker who engages in discriminatory conduct would not fall within the definition of an employer and, consequently, may not be held individually liable for his conduct. See, e.g., *Hale v. Dayton* (Feb. 8, 2002), Montgomery App. No. 18800, 2002 WL 191588 (firefighter, as a mere co-worker, was not individually liable under Chapter 4112); *Singer v. UAW Local Union 1112* (Apr. 30, 2002), Trumbull App. No. 2001–T–0028, 2002 WL 818887 (co-worker could not independently violate

R.C. Chapter 4112 "since it does not address discrimination on the part of fellow employees in non-supervisory positions"). R.C. 4112.02(A) expressly prohibits discriminatory conduct by employers, and R.C. 4112.99 provides a cause of action against employers who violate the chapter.

{¶ 72} The state of Ohio, through R.C. Chapter 4112, has expressed a strong policy against discrimination, and the Supreme Court has construed the statute liberally to effectuate that policy. R.C. 4112.08; *Genaro*, 84 Ohio St.3d at 296, 703 N.E.2d 782. As stated in *Genaro*:

{¶ 73} "This court has noted in numerous cases the existence of a strong public policy against discrimination. A majority of this court have, time and time again, found there is no place in this state for any sort of discrimination no matter its size, shape, or form or in what clothes it might masquerade. This, of course, includes discrimination in the workplace. For instance, in *Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 133, 543 N.E.2d 1212, 1215, we stated that 'there appears to be little question that R.C. Chapter 4112 is comprehensive legislation designed to provide a wide variety of remedies for employment discrimination in its various forms.' * * * By holding supervisors and managers individually liable for their discriminatory actions, the antidiscrimination purposes of R.C. Chapter 4112 are facilitated, thereby furthering the public policy goals of this state regarding workplace discrimination." Id. at 296–297, 543 N.E.2d 1212.

{¶ 74} By recognizing that supervisors and managers fall within the definition of "employer," the Supreme Court deemed supervisors to be co-employers with the companies for whom they worked. The purpose of including supervisors and managers as employers was to expand the parties who could be held responsible for conduct that violated R.C. Chapter 4112 and to further the antidiscrimination goals of the statute—not to provide an escape clause for the employing company which, due to greater assets and resources, may be more willing to enter into and continue protracted litigation. To allow a settlement by the supervisor to release the company, both of whom are subject to liability under R.C. Chapter 4112 as co-employers, is contrary to the statutory framework and its antidiscriminatory goals.

{¶ 75} The Supreme Court of Ohio's holding in *Genaro* that a supervisor/manager may be held "jointly and severally liable with her/his employer" is consistent with this approach. When parties are jointly and severally liable, each defendant may be held liable. *Shoemaker v. Crawford* (1991), 78 Ohio App.3d 53, 66–67, 603 N.E.2d 1114. The plaintiff may obtain a judgment against any of the joint tortfeasors for the entire amount, and the tortfeasors may apportion their liability and seek contribution among themselves. Id. A settle-

ment between one or more tortfeasors with the plaintiff does not extinguish the plaintiff's claim against the remaining tortfeasors. See id.

{¶ 76} We hold that the settlement between Edwards and Webster did not extinguish Edwards's claim under R.C. Chapter 4112 against OICC.

{¶ 77} The second assignment of error is overruled.

{¶ 78} IV. "The trial court erred as a matter of law by denying OICC's motion for a new trial based on the improper statements made by appellee's counsel during closing argument."

{¶ 79} In its fourth assignment of error, OICC challenges statements made by Edwards's counsel during closing argument. It claims that Edwards's counsel improperly accused OICC's witnesses of lying and OICC's trial counsel of suborning perjury.

{¶ 80} Generally, trial counsel is entitled to considerable latitude in the presentation of closing argument. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph two of the syllabus. The Supreme Court of Ohio has recognized, however, that abusive remarks and tactics can undermine the fairness of the trial and that the trial judge has a duty "to see that counsel do not create an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice cannot be accomplished." *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d 495, 721 N.E.2d 1011; see *Fehrenbach v. O'Malley*, 164 Ohio App.3d 80, 841 N.E.2d 350 (2005). "When argument spills into disparagement not based on any evidence, it is improper." *Clark v. Doe* (1997), 119 Ohio App.3d 296, 307, 695 N.E.2d 276.

{¶ 81} Ordinarily, in order to support a reversal of a judgment based on improper closing argument to the jury, it is necessary that counsel interject a proper and timely objection to the claimed improper remarks so that the court may take proper action thereon. *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 44 O.O.2d 18, 238 N.E.2d 563, paragraph one of the syllabus; *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464. Thus, the determination of whether remarks made during closing argument exceeded the bounds of permissible argument is a discretionary function to be performed, in the first instance, by the trial court. *Pang*, at paragraph three of the syllabus. The trial court's determination is reviewed for an abuse of discretion. Id.

{¶ 82} However, " '[w]here gross and abusive conduct occurs, the trial court is bound, sua sponte, to correct the prejudicial effect of counsel's misconduct.' " (Emphasis deleted.) *Pesek*, 87 Ohio St.3d at 501, 721 N.E.2d 1011, quoting *Snyder*, 15 Ohio St.2d at 37, 44 O.O.2d 18, 238 N.E.2d 563. If " 'there is room for doubt, whether the verdict was rendered upon the evidence, or may

have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party.'" Id. at 502, 721 N.E.2d 1011, quoting *Warder, Bushnell & Glessner Co. v. Jacobs* (1898), 58 Ohio St. 77, 85, 50 N.E. 97.

{¶ 83} In this case, neither counsel made any objections during the closing argument. Accordingly, to warrant reversal, the alleged improper remarks must have been sufficiently egregious to require the court to interject sua sponte. In our view, counsel's comments did not rise to that level.

{¶ 84} As raised by OICC on appeal, Edwards's counsel explicitly asked the jury to consider that OICC's witnesses have "not been telling you the truth." The crux of Edwards's counsel's argument was that the witnesses for OICC—Caskey, Webster, Brandenburg, and Bumgardner—generally should not be believed and that Edwards should be believed. He emphasized that Caskey made several contradictions in her testimony and that Webster claimed not to recall whether he had asked Edwards to have sex with him. Edwards's counsel suggested that Dahdah had masterminded Edwards's termination and that she could have retrieved the e-mails if she had wanted to substantiate Edwards's harassment claims, and he asserted the OICC had fabricated the tardiness and dress-code violations to support Edwards's discharge. Edwards's counsel also emphasized that Edwards's testimony was consistent with her prior deposition. OICC's witnesses contradicted most facets of Edwards's testimony, including whether Edwards approached Caskey for assistance, whether Webster repeatedly sent sexually-harassing e-mails, whether Dahdah would fairly investigate Edwards's claim of sexual harassment, the ability to retrieve the e-mails from the computer, and Edwards's performance as an employee.

{¶ 85} Although counsel may not make unwarranted attacks on a witness's character, it is not improper to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization. See *State v. Baker*, 159 Ohio App.3d 462, 467–468, 2005-Ohio-45, 824 N.E.2d 162, ¶ 19. Here, as Edwards's counsel noted, whether Edwards's or OICC's witnesses were telling the truth was "the heart of this whole Jury trial. You can't really believe both sides * * *." The jury's verdict on Edwards's sexual-harassment claim was, in essence, an assessment of Edwards's credibility versus OICC's witnesses' credibility. Although Edwards's counsel made disparaging comments about OICC's witnesses and asserted that they were lying, the comments were tied to their testimony and were within the bounds of acceptable argument.

{¶ 86} It bears noting that OICC's counsel took the same approach during its closing argument. Counsel argued that Edwards's testimony was contradicted by each of OICC's witnesses, that Edwards could have obtained proof of the harassment but did not, and that Edwards was "[t]he only witness in here who had any motivation to lie to you."

{¶ 87} OICC further challenges Edwards's counsel's statement during his rebuttal argument that OICC's counsel "should have known that [people lie under oath for money] because he put witnesses on there to lie, but he didn't ask them that." Edwards's counsel later stated that OICC's witness "weren't skillful at lying." We agree that Edwards's counsel skirted the line between acceptable closing argument and disparagement of opposing counsel. However, reading the closing argument as a whole, we do not conclude that Edwards's argument went beyond acceptable closing argument and warrants reversal.

{¶ 88} The fourth assignment of error is overruled.

{¶ 89} III. "The verdict returned by the jury should be overturned because the amount of damages awarded to appellee was against the manifest weight of the evidence."

{¶ 90} V. "The trial court erred in denying OICC's motion for remitter [sic]."

{¶ 91} In its third assignment of error, OICC claims that the evidence presented at trial was insufficient to support an award of compensatory damages in the amount of $200,000. It argues that the jury's award "was gross and a shock to any sense of justice and fairness." In its fifth assignment of error, OICC contends that the trial court should have granted its motion for a remittitur because the damages were excessive.

{¶ 92} Edwards testified that beginning in March 2003, Webster sent unwanted e-mails asking personal questions and involving sexual content. Ultimately, Webster was sending approximately 20 to 30 messages per day. Edwards indicated that the harassment made her "feel like a piece of meat" and "degraded." She stated that her stress level went "through the roof," she was a "nervous wreck," and she worried about where Webster was going to go next and how she was going to stop it. Edwards stated that she could not sleep or eat, she developed stomach problems and her blood pressure became elevated (160 over 122). Edwards was provided medication for her stomach, and her doctor had recommended blood pressure medication. Edwards stated that she lost 25 pounds from the time the sexual harassment began until she was terminated.

{¶ 93} In our view, the award of $200,000, while generous, was neither excessive nor against the manifest weight of the evidence.

{¶ 94} The third and fifth assignments of error are overruled.

{¶ 95} In light of our disposition of the first assignment of error, the judgment of the trial court is reversed and the matter is remanded for a new trial.

Judgment reversed
and cause remanded.

FAIN and DONOVAN, JJ., concur.