[Cite as *McDonald v. Burton*, 2011-Ohio-6178.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

NICOLE McDONALD, et al.          :
                                 :
    Plaintiffs-Appellees         :          Appellate Case No. 24274
                                 :
v.                               :          Trial Court Case Nos. 08-CV-03225
                                 :                               08-CV-04614
ARTHUR BURTON                    :
                                 :
    Defendant-Appellant          :          (Civil Appeal from
                                 :              Common Pleas Court)
                                 :
      . . . . . . . . . .

## O P I N I O N

Rendered on the 2nd day of December, 2011.

. . . . . . . . . . .

ANDREW L. MARGOLIUS, Atty. Reg. #0003402, Margolius, Margolius & Associates, 55 Public Square, Suite 1100, Cleveland, Ohio 44113
    Attorney for Plaintiff-Appellees McDonald, FHAA, and Curry

MIKE DeWINE, Attorney General of Ohio, by DUFFY JAMIESON, Atty. Reg. #0042408, and CAROLYN E. GUTOWSKI, Atty. Reg. #0085748, 30 East Broad Street, 15th Floor, Columbus, Ohio 43215-3428
    Attorneys for Plaintiff-Appellee OCRC

DWIGHT D. BRANNON, Atty. Reg. # 0021657, and MATTHEW C. SCHULTZ, Atty. Reg. #0080142, Brannon & Associates, 130 West Second Street, Suite 900, Dayton, Ohio 45402
    Attorneys for Defendant-Appellant Burton

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Arthur Burton appeals from an order denying his motions

for judgment notwithstanding the verdict and for a new trial, and from an award of attorney fees to plaintiffs-appellees. Following a jury trial, the jury awarded plaintiff-appellee Nicole McDonald $50,000 for a hostile environment housing claim; $50,000 for a quid pro quo housing claim; $50,000 for a hostile environment employment claim, and $50,000 in punitive damages. The jury also awarded plaintiff-appellee Fair Housing Advocates Association (FHAA) $18,640 for a housing discrimination claim and $25,000 in punitive damages. Finally, the trial court awarded the following attorney fees and expenses: $173,261.35 to McDonald and FHAA, and $64,330.55 to the Ohio Civil Rights Commission (OCRC), plus interest at the statutory rate from the date of judgment.

{¶ 2} Burton contends that the trial court erred by submitting a special verdict form to the jury, as opposed to a general verdict form, in violation of Civ. R. 49. Burton also maintains that the trial court erred in denying his motion for a new trial, and by denying his motion for judgment notwithstanding the verdict. In addition, Burton contends that the trial court erred in rendering partial summary judgment to appellees on his counterclaims and third-party claim for violation of R.C. 2933.52. Finally, Burton alleges that the punitive damages award violates the Ohio and United States Constitutions and the statutory provisions under the Tort Reform Act, S.B. 80, and R.C. 2315.21.

{¶ 3} We conclude that the trial court erred when it overruled the motion for a new trial, because the damage awards are excessive, and appear to have been given under the influence of passion or prejudice. We further conclude that the trial court erred in failing to grant Burton's motion for judgment notwithstanding the verdict with regard to the quid pro quo harassment housing claim. When the evidence is construed most strongly in McDonald's

favor, no reasonable mind could find in favor of McDonald on that claim.

{¶ 4} The trial court did not err in rendering partial summary judgment against Burton on his counterclaims and third-party complaint for violation of R.C. 2933.52. There are no genuine issues of material fact regarding a tape-recording that was made by McDonald for the purpose of committing a criminal act, tortious act, or other injurious act. Finally, arguments regarding whether jury verdict forms and punitive damages were proper are moot, due to the disposition of the other assignments of error.

{¶ 5} Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.

I

{¶ 6} The case before us arises from a one-week landlord-tenant relationship between Arthur Burton and Nicole McDonald. At the time, Burton was about 58 years old and owned fifty rental units located in Kettering, Ohio. McDonald was 20 years old.

{¶ 7} In April 2007, McDonald was looking for an apartment for herself and her 17-year- old sister, Michelle. On Saturday, April 7, 2007, McDonald went with her mother, sister, and grandparents to Burton's apartment complex, which was close to McDonald's grandparents' house. Burton showed them unit 1243-C, which was on the second level. During the showing, Burton discovered that he had taken a jujitsu class with McDonald's grandmother a number of years ago. Burton had a black belt in Shushodo and a brown belt in judo, and performed some judo moves that day.

{¶ 8} McDonald signed an application on Saturday, and gave Burton a $200 deposit. One defect in the apartment was the entry door, which had been kicked in when a tenant had

forgotten her key. Because this had happened a number of times with tenants, Burton no longer used entry locks. The entry lock was used as a handle to open and close the door, and the deadlock was used for security. The inner lining and molding around the door were also gone. Burton promised to fix the door by the time McDonald and her sister moved in.

{¶ 9} McDonald moved in on Sunday, April 8, 2007. She signed a year's lease on that date, at $480 per month. McDonald's grandparents paid Burton a pro-rated amount for the month of April, and indicated that they would pay the rent if McDonald had any problems. McDonald had just quit a job as a telemarketer for a company called Infocision, and planned to start a new job at Speedway, making $7.85 an hour. McDonald and her sister moved in furniture and clothes on Sunday, and her grandfather took them shopping for food. The door was not yet fixed, and Burton promised to come and repair it. Burton also took a photograph of McDonald and her sister, ostensibly for proof of identity, since Michelle was not on the lease. At some point, McDonald and Burton discussed the possibility of her doing some work for him. Burton knew she was between jobs, and said he could use some help cleaning out some vacant apartments.

{¶ 10} After McDonald moved in on Sunday, Burton came over and tried to repair the door. There was a factual dispute about whether the door was properly repaired. Burton indicated the deadbolt was operational after he repaired the door on Sunday, and would prevent anyone from entering the apartment; McDonald claimed that the door was never fixed, and that someone could just push through the door.

{¶ 11} On Monday, Burton returned again to work on the door, for an hour or two, and claimed to have overheard McDonald commenting about men. McDonald was yelling at her

boyfriend, slammed down the phone, and said, "I hate men! I hate 'em!" She also said, "I hate men, but I have to be serviced on a regular basis!" Trial Transcript, Volume II, p. 306. McDonald denied making these remarks. Burton's girlfriend, Frances Ledford, testified that she was at the apartment helping Burton when McDonald made these remarks, but McDonald denied ever meeting Ledford.

{¶ 12} On Tuesday, both McDonald and Michelle did some work for Burton, cleaning out apartments and carrying items to the dumpster. Nothing untoward occurred that day, and Burton just asked both of the women general questions. McDonald mentioned that she had taken quite a few computer classes, and offered to help Burton with a problem he was having with his computer. McDonald claimed that Burton returned to work on the door Tuesday evening, and told her sister that he liked his women younger, so they could keep up with him. He did not make other inappropriate remarks at that time.

{¶ 13} McDonald never filled out a job application, nor did she have any certain hours of employment or benefits. Burton had never had employees for the 24 years that he had managed the properties. He did the maintenance, lawn care, rentals, and evictions by himself. He occasionally hired spot labor, including tenants, to do work.

{¶ 14} On Wednesday, McDonald came to Burton's house to work on his computer. Burton lived in a double located between the two apartment complexes he owned. When McDonald came in, she noticed that Burton had a pornographic show on the television. She testified that Burton asked her to come and watch it with him, but she refused. She asked him to turn it off, but he did not. Instead, he closed a little partition or door, and said that he constantly recorded the pornographic channel. Burton denied asking McDonald to watch the

show with him.

{¶ 15} McDonald helped Burton register some software, and talked to Verizon about a problem with Burton's internet. McDonald testified that during the time she worked, Burton asked her several times to engage in sex, but she refused. She tried everything she could to get him to back off. She told him she had a boyfriend named Jason, and that if she were going to do anything like that, it would be with Jason, not Burton. She also told Burton she was not attracted to him. According to McDonald, Burton touched her buttocks and touched her arms several times. She asked him not to touch her.

{¶ 16} McDonald testified that Burton made inappropriate statements, asking if she "spit or swallowed," and told her that her p*ssy did not belong to Jason; it belonged to him. After McDonald would tell Burton no, he would stop for a few minutes and then go right back to the subject. He also offered to pay McDonald $8.00 per hour (the previously agreed-upon wage) if they had sex, because she would lose time where she otherwise could have been earning money. McDonald testified that Burton came to her apartment twenty minutes after she left work on Wednesday, ostensibly to work on the door.

{¶ 17} Burton denied making inappropriate remarks, flirting with McDonald, or employing sexual innuendo on Wednesday. He also denied being at her apartment to fix the door after Tuesday. In addition, Burton testified that McDonald did not tell him on Wednesday that anything he said was offensive, threatening or humiliating.

{¶ 18} McDonald testified that she was extremely upset, offended, and humiliated by Burton's remarks. She was a wreck and did not know what to do. She called her mother and grandparents. After McDonald called her grandfather, Herman, screaming and crying,

Herman told her that he would be right over. Herman and his wife stayed at the apartment until late that evening. They thought McDonald would be all right, because McDonald and her sister had a boyfriend and another individual there to stay all night with them. Herman's wife also told them to put the couch up against the door and lock it.

{¶ 19} The next day (Thursday), McDonald called the police and met them at Speedway, because she was afraid of what would happen if the police came to her apartment. After talking with the police, she did not feel they could be helpful, because she had no proof. She then called her mother, who suggested that she call FHAA.

{¶ 20} FHAA is a private, non-profit organization that seeks to promote equal housing opportunities through education, advocacy, and enforcement of fair housing laws. Vincent Curry is the Executive Director of FHAA, which employs one other individual. FHAA's funding comes from payment from cities and counties to engage in fair housing services, and from damages from lawsuits. Curry is the individual who spoke with McDonald on Thursday, April 12, 2007. At the end of their discussion, they agreed that McDonald would attempt to record her interactions with Burton. McDonald's grandfather then purchased a tape recorder for her.

{¶ 21} On Friday, April 13, 2007, McDonald returned to Burton's house to work for him, with a tape recorder hidden in her bra. She stayed for several hours, while recording their conversations. She did not turn off the tape recorder until she left. McDonald then had the tapes transcribed by a court reporter. During trial, Burton was called as the first witness for the defense, and was impeached with parts of the transcript of the recording. Defense counsel was allowed to conduct direct examination of Burton immediately afterward, and the

entire tape recording was played for the jury.

{¶ 22} The following is an example of the content of the tape:

{¶ 23} "MR. BURTON: I've been told they make more money on the ink cartridges –

{¶ 24} "MS. MCDONALD:    Then [sic] they do on the computers.    So what were you watching the other day?    What was that called?

{¶ 25} "MR. BURTON:    What?

{¶ 26} "MS. MCDONALD:    The porno.

{¶ 27} "MR. BURTON:    10 Ecstacy Channel.

{¶ 28} "MS. MCDONALD:    10 Ecstacy Channel?

{¶ 29} "MR. BURTON:    It's on there now.    Look at the stuff they advertise.    You'll get a kick out of it.

{¶ 30} "MS. MCDONALD:    Every time I've come over, you've got some kind of porno.

{¶ 31} "MR. BURTON:    It's a continuous channel.

{¶ 32} "MS. MCDONALD:    So you just continuously leave porn on?

{¶ 33} "MR. BURTON:    Well, let me tell you here, the reason being is this.    So I can go back – here watch.    I can go back two hours on my DVR, okay.    Now if I come in here and just turn it on, all I'll have access to is the time it's been on.    Well, watch this. I can go back, every time I want to turn it on this morning.    See this.    I tell you what.    This porn shit is worth, like mainstream, look at the props and stuff.    It's like some type of oasis or something.

{¶ 34} "MS. MCDONALD:    It's all disgusting to me.

{¶ **35**} "MR. BURTON:   (Inaudible) think you're not.

{¶ **36**} "MS. MCDONALD:   That's my personal choice.

{¶ **37**} "MR. BURTON:   What does that mean?

{¶ **38**} "MS. MCDONALD:   Yeah, I do.

{¶ **39**} "MR. BURTON:   Watch, a lot of people do whatever.   Go back tomorrow. Go back two hours and record.

{¶ **40**} "MS. MCDONALD:   Because that might be something Jason is interested in. What kind of network do you have?

{¶ **41**} "MR. BURTON:   Who?

{¶ **42**} "MS. MCDONALD:   Jason.   He's into all the porns.

{¶ **43**} "MR. BURTON:   Is he?

{¶ **44**} "MS. MCDONALD:   What kind of network do you have?

{¶ **45**} "MR. BURTON:   It's a satellite dish.   Dish Network.

{¶ **46**} "MS. MCDONALD:   It's Dish Network?

{¶ **47**} "MR. BURTON:   Dish Network this alone – this porn channel is f*cking $27 dollars a month.

{¶ **48**} "MS. MCDONALD:   He would pay it.   He would pay it.   Trust me.

{¶ **49**} "MR. BURTON:   You can get it here.   Take it.   Look.   Here's what's available.   Let me see, okay.   I go into there.   Here's all the other channels.   Watch.

{¶ **50**} " * * *

{¶ **51**} "MS. MCDONALD:   So now you're watching Jesse James and Marvelous?

{¶ **52**} "MR. BURTON:   I think that's what's on there.

{¶ 53} "MS. MCDONALD:   That's crazy.

{¶ 54} "MR. BURTON:   What's crazy about that?

{¶ 55} "MS. MCDONALD:   Smacking my butt.

{¶ 56} "MR. BURTON:   You don't want to fool around, huh?

{¶ 57} "MS. MCDONALD:   No.   I told you the other day I don't want to fool around.

{¶ 58} "MR. BURTON:   So whatever I'm doing is offending you?

{¶ 59} "MS. MCDONALD:   I told you that I don't want to fool around.

{¶ 60} "MR. BURTON:   I won't do it no more.   I won't do it.

{¶ 61} "MS. MCDONALD:   And I really didn't appreciate the fact that you said you would pay me for the day.   That was pretty disrespectful.

{¶ 62} "MR. BURTON:   What do you mean?   I don't know what you mean.   What –

{¶ 63} "MS. MCDONALD:   How you said we could stay in the bedroom and you'd f*ck my brains out and then just, oh well, I'd still pay you for the day.   That was pretty disrespectful in my eyes.

{¶ 64} "MR. BURTON:   I didn't mean it that way.

{¶ 65} "MS. MCDONALD:   You made me feel like a prostitute.

{¶ 66} "MR. BURTON:   I just didn't want you to think you were not going to get paid or whatever, okay.   That's all right.   You don't want to do it.   That's fine, okay.   It's no big deal. What I need to work is somebody to help clean the apartments and stuff.   It would be kind of nice to have something, sexual going on too, but that's fine.   I don't need that, okay. We [sic] good.   All right.

{¶ 67} "MS. MCDONALD:   I just didn't feel that it was respectful, and I didn't

appreciate the comment that your p*ssy doesn't belong to Jason.   It belongs to me.

{¶ 68} "MR. BURTON:   I said that?

{¶ 69} "MS. MCDONALD:   You said that.

{¶ 70} "MR. BURTON:   Well, that was stupid.   I said that?

{¶ 71} "MS. MCDONALD:   You said more things than you realize, and that it would be the best sex I ever had.   Do you remember the conversation?

{¶ 72} "MR. BURTON:   It would be.   Let's put it this way, you told me you were just using Jason for sex.   I basically insinuated just use me.   But that's cool.   We're good. What I need to do here is, what's this one.   I can't even complain about, the only thing it does

{¶ 73} is –

{¶ 74} "MS. MCDONALD:   Takes forever to start.

{¶ 75} "MR. BURTON:   Warming up, sometimes I think what it's doing is, the little light in here, whatever.   Oh my God, I hate to think how many copies this thing has made. All I've ever done is put ink jet cartridges in it.   That's all I've ever done.

{¶ 76} "MS. MCDONALD:   Looks like it's still printing fine even though it says out of ink.

{¶ 77} "MR. BURTON:   It still saying that?   Out of ink?

{¶ 78} "MS. MCDONALD:    No, but you said a few minutes ago, it was out of ink, but it's still printing (inaudible).

{¶ 79} "MR. BURTON:   You were saying that he – what did you say the other day? How did you find guys to have sex with?   How did you say that?

{¶ 80} "MS. MCDONALD:   Well, you asked about Jason, and you asked if he was

my boyfriend and all that.

{¶ 81} "MR. BURTON:  You said no. He's just somebody, a friend if you want to have sex with him you do, right?

{¶ 82} "MS. MCDONALD:   Yeah, pretty much.

{¶ 83} "MR. BURTON:   Okay.   That's cool.   What am I doing here?

{¶ 84} "MS. MCDONALD:   You're getting distracted.

{¶ 85} "MR. BURTON:   This one, look at the quality of that one.   Is my copy that bad?

{¶ 86} "MS. MCDONALD:   No, that looks better than the original one, darker as long as it don't [sic] bleed and start running together."   Plaintiff's Ex. 2, pp. 27-35.

{¶ 87} Despite having been told that McDonald was not interested, Burton returned to the subject on various occasions throughout 145 pages of transcript.   About twelve pages later, the following exchange occurred:

{¶ 88} "MR.  BURTON:  You got me analyzing here.   The only reason I said that, you said you were going to get, when you get horny, when you want to get laid, you got somebody you can call.   You can always get laid.   That's why I brought all that up.   Had you wanted to get laid, what the hell is wrong with me?   But if you don't want me around, that's fine too.

{¶ 89} "MS. MCDONALD:   Landlord/tenant thing.

{¶ 90} "MR. BURTON:  What?   That's silly.   I mean, business is business.   You still got to pay the rent no matter what.   If we're having sex or whatever, that ain't got nothing to do with the rent.   Okay. I wasn't trying to pay you for your p*ssy.   I was simply saying,

hey, the time we spend here, you're still working. I'm not trying to pay you for your —

{¶ 91} "MS. MCDONALD: Yeah, but that's still the same thing.

{¶ 92} "MR. BURTON: No it is not. If we're over here fooling around, you're not able to make, making, working, so that's not fair to you, but if we're over here having sex while you could have been over here working making money. Well, $8 an hour is nothing. You just, you know, it would be extremely therapeutic to me. It's relaxing. It's an adventure. * * * " Plaintiff's Ex. 2, pp. 47-48.

{¶ 93} After discussing business again for about fourteen pages, Burton again returned to sexual matters, in the following exchange:

{¶ 94} "MR. BURTON: * * * I don't want to offend you. I'd love to have sex with you but if that ain't going to happen, whatever. I need this shit done, okay. Does that make sense? You don't have any, I don't know what the f*ck to call it, attraction, what the hell, no attraction whatsoever to me?

{¶ 95} "MS. MCDONALD: Nope.

{¶ 96} "MR. BURTON: Why not?

{¶ 97} "MS. MCDONALD: I keep my business, business, and my personal, personal.

{¶ 98} "MR. BURTON: Sorry. No attraction? Because the business – I do the same thing. Business is business. Anything we would do would be nothing to do with the business.

{¶ 99} "MS. MCDONALD: But it interferes with the business.

{¶ 100} "MR. BURTON: It's not going to interfere with anything. You know it ain't no biggie. You're, you f*cking turn me on but you're [sic] very attractive woman. I'll

loose [sic] my composure.   Attraction is not a big word.   Women are attracted to me.   I ain't being accused.   I ain't been rejected like this for a long time, but little heartbreaker, you know.

{¶ 101} "But no, this was B-4.   What I do is this.   I have to get them properly served. I can get them out fairly easily but –

{¶ 102} "MS.  MCDONALD: They have got to get served."   Plaintiff's Ex. 2, pp. 62-64.

{¶ 103} After Burton discussed business matters for several more pages, the following exchange occurred:

{¶ 104} "MR. BURTON:   Go over next door.   I got to get my stuff before we do that one.   I've got to paint it and go over the carpet.   That's why your picture ID looks different. Did I tell you how photogenic you were in the picture?   You're [sic] hair was down.   You're pretty with your hair down.   I won't say pretty.   It's more complimenting.   I wouldn't have, I wouldn't have done any hitting on you.   I would have probably, not as drastically, but you said you want to get laid.

{¶ 105} "MS. MCDONALD: I never said that.   I said I'd call Jason when I want to get laid.

{¶ 106} "MR. BURTON:   You said you get laid whenever you wanted to.   When I want to get laid, I can get laid.

{¶ 107} "MS.  MCDONALD:   That's true.   As a woman if you want to get laid, you can get laid.

{¶ 108} " * * *

{¶ **109**} "MS. MCDONALD: * * * That's different because me and Jason have no business relationship.

{¶ **110**} "MR. BURTON: We don't either. You've got to pay the rent, evening [sic] that you work or whatever, is different. It's separate. It ain't got nothing to do with that. Us having sex, whatever, being intimate, wouldn't have nothing to do with our business. You don't see how I already separated it? I make sure that you get paid for work, so that's it. No matter what. If you don't pay the rent, I'll evict your ass, and you'll probably if you don't pay the rent and I evict you, you'll probably say I sexually harassed you. All the women do.

{¶ **111**} "MS. MCDONALD: How many women have you had that press sexual harassment charges on you?

{¶ **112**} "MR. BURTON: None. There is no substance to it[;] there's nothing to it. That's what women do. I've had women friggin that get pissed off at you because you don't make any advances at them. You don't show them any attention. You know. You know that. * * *

{¶ **113**} "MS. MCDONALD: Yeah, but it's not really a good idea to –

{¶ **114**} "MR. BURTON: Why not? You situation is – I'll be honest with you. I'm attracted to you sexually. The thing about it. I need your little ass for – this is pretty cool. You've got computer skills, you know. I need that.

{¶ **115**} "MS. MCDONALD: I know but the fact with me is we were supposed to do business. Then I come over here and you got porno on.

{¶ **116**} "MR. BURTON: The porno thing is always on. I told you the reason why.

It wasn't to friggin sexually harass you or anything.

{¶ **117**} "MS. MCDONALD: And then you're asking me questions about my sex life and –

{¶ **118**} "MR. BURTON: I was just making conversation. You initiated when I was upstairs. I didn't say nothing. You was talking about the only thing you need a man for was sex, so on and so forth, and I shouldn't have no trouble getting laid or whatever. Well, I don't either. I'm picking. I'm not just going to f*ck anybody. I mean, I guarantee you within an hour, half hour's time I could have somebody over here. * * *

{¶ **119**} " * * *

{¶ **120**} "MS. MCDONALD: But the part that offended me was the fact that you would still pay me for the day even if we stayed here.

{¶ **121**} "MR. BURTON: You should have been complimented at that. What would you rather me do? What if we had sex for two or three hours and then you lost three hours of money you needed to pay your bills. Think about it sweetheart.

{¶ **122**} "MS. MCDONALD: That makes me look like a prostitute, a bad person.

{¶ **123**} "MR. BURTON: I just did it because of, hey, it would be, what an adventure it would have been and how relaxing it would have been, okay? * * *

{¶ **124**} " * * *

{¶ **125**} "MR. BURTON: * * * Unbelievable to have sex with you. Sex, make love to you. It ain't just sex. I'm attracted to you. I don't think you're attracted to me obviously, so you're not attracted to me whatsoever?

{¶ **126**} "MS. MCDONALD: No.

{¶ **127**} "MR. BURTON:   No?

{¶ **128**} "MS. MCDONALD:   I keep business, business.   I keep personal, personal.

{¶ **129**} "MR. BURTON:   Oh my God.   Can I get you a little recording here, push the button. All you have to do is have a little remote control, a little gadget.   I keep business, business, and personal, personal.   You ever see these recorded things?   Yeah, right. Like it's got ten statements.

{¶ **130**} "MS. MCDONALD:   Yeah, probably.

{¶ **131**} "MR. BURTON:   I keep business, business.   If we were to be intimate, okay.  Hey, business is business.   You still got to pay rent.   Let me tell you why.   I don't have enough money to pay the friggin bills.   You've got to pay the rent so I can pay the mortgage company. * * *

{¶ **132**} " * * *

{¶ **133**} "MR. BURTON:   I keep business, business.   Business is business.   I don't have any choice, okay. * * * What you said, business, business, and what?

{¶ **134**} "MS. MCDONALD:   Personal, personal.

{¶ **135**} "MR. BURTON:   Personal, personal.   All right.   There's my mortgage payment.   I hate that f*cking bill.   It's a whole new market now.   I got a lady I need to call today I want to show her, I got a couple apartments over there in pretty good shape so they can walk them through.   Because I've been a realtor for 15 years, okay.   I can make damn, I can make good money selling real estate.   I'm a pretty good talker.   Am I a pretty good talker, sweetie?

{¶ **136**} "MS. MCDONALD:   Yeah.

{¶ 137} "MR. BURTON:   Can't talk you out of your pants, though, can I?   Ain't worth shit on that, am I?

{¶ 138} "MS. MCDONALD:   Nope.

{¶ 139} "MR. BURTON:   But that's all right.   There's my payment.   How much?

{¶ 140} "MS. MCDONALD:   9,641.

{¶ 141} "MR. BURTON:   I got to pay that payment or guess what?   My late fee is 600, $680.

{¶ 142} "MS. MCDONALD: Gee, that's a big late fee.

{¶ 143} "MR. BURTON:   Yeah, no shit.   So you want to know why I'm an asshole? Hey I ain't got no choice. * * * "   Plaintiff's Ex. 2, pp. 73-81.

{¶ 144} The same pattern of mixing business with sexual comments continued until McDonald left the premises, after pretending that her mother was ill and needed to be taken to the hospital.   As McDonald left, the following exchange occurred:

{¶ 145} "MR. BURTON:   Keep our shit to ourselves, promise me?

{¶ 146} "MS. MCDONALD:   I promise.

{¶ 147} "MR. BURTON:   Don't tell your mom.   I don't want your mom to think bad of me trying to hit on her daughter."   Plaintiff's Ex. 2, p. 145.

{¶ 148} During his testimony at trial, Burton denied wanting a relationship with McDonald, trying to have sex with her, or trying to have an intimate relationship with her. He also denied wanting to have any sex or intimacy with her, and denied having pornography playing in his apartment when she arrived on Wednesday.   He made these denials, even after being confronted with portions of the transcript that was made from the tape-recording.

Burton claimed he was joking or flirting, and that he was set up by McDonald.

{¶ 149} After leaving work on Friday, McDonald did not hear from Burton that weekend. He did not come to the apartment to do further repairs. McDonald and her sister vacated the apartment on Sunday, April 15, 2007, taking pictures to prove that they left the apartment in good condition.

{¶ 150} After hearing the tape-recording, Curry helped McDonald file an administrative complaint with the OCRC. Curry also talked with Burton, who initially denied the allegations and claimed that McDonald was nothing but a crackhead, heroin addict, etc. Curry also visited the apartment complex, took pictures, and attempted to speak with tenants. In addition, Curry distributed flyers at the complex. The flyers were entitled "Sexual Harassment is Prohibited by Fair Housing Law."

{¶ 151} Curry also sent a press release to the Dayton Daily News. In response to a question from a reporter, Curry stated that this was one of the most blatant cases of sexual harassment that his organization had ever investigated.

{¶ 152} After the OCRC issued a probable cause determination, McDonald and FHAA filed a complaint against Burton in April 2008, designated as Montgomery County Common Pleas Court Case No. 2008 CV 03225. The complaint alleged that Burton's conduct had resulted in the unavailability of rental housing for McDonald; that through his sexual harassment of McDonald, he had subjected McDonald to differing terms and conditions of residency compared with those for similarly situated male residents; that he had expressed preferences, limitations, or discrimination based on McDonald's female gender; that FHAA had expended time and resources investigating Burton's wanton and intentional acts; that

Burton's conduct had unreasonably interfered with and intimidated McDonald as well as FHAA in the full exercise of McDonald's housing rights; and that Burton's actions constituted quid pro quo sexual harassment discrimination and a hostile environment. Burton filed an answer and counterclaims for improperly taping a conversation in violation of R.C. 2933.52, and for false light, invasion of privacy, and defamation.

{¶ 153} In May 2008, the OCRC also filed an action against Burton, which was designated as Montgomery County Common Pleas Court Case No. 2008 CV 04614. The complaint alleged sexual harassment in violation of R.C. 4112.02(H)(1), unlawful housing discrimination in violation of R.C. 4112.02(H)(4), and unlawful coercion or intimidation in violation of R.C. 4112.02(H)(12). In response, Burton filed an answer and third-party complaint against McDonald, FHAA, and Curry for invasion of privacy (false light, intrusion, and publication of private facts), defamation, and unauthorized recording under R.C. 2933.52.

{¶ 154} The cases were consolidated in July 2008. In August 2008, the trial court issued a decision on a motion in limine filed by Burton. The court held that tape-recording with one-party consent is not a violation of Ohio law. In July 2009, the trial court granted the plaintiffs' motion for partial summary judgment on all of Burton's third-party claims and counterclaims. The court also granted summary judgment to Burton on the plaintiffs' claim for unavailability. The court concluded that there was no indication that Burton made a false representation that the apartment was unavailable when it was available. After a jury trial, the jury awarded McDonald $50,000 on her hostile environment housing claim; $50,000 on her quid pro quo housing claim; $50,000 on her hostile environment employment claim; zero dollars for her quid pro quo employment claim, and zero dollars for her retaliation claim. The

jury also awarded FHAA $18,640 for its housing discrimination claim and zero dollars for its retaliation claim. Curry was awarded zero dollars for his retaliation claim.

{¶ 155} Because the punitive damages claims had been bifurcated, the jury heard additional evidence on punitive damages. The jury then awarded punitive damages of $50,000 to McDonald and $25,000 to FHAA. Burton filed a motion for judgment notwithstanding the verdict and a motion for a new trial, which were overruled by the court. The trial court also awarded attorney fees to McDonald, FHAA, and the OCRC. Burton appeals from the judgment overruling the motion for judgment notwithstanding the verdict and motion for a new trial, and from the judgment awarding attorney fees.

{¶ 156} II

{¶ 157} For purposes of convenience, we will address the assignments of error out of order. Burton's Second Assignment of Error is as follows:

{¶ 158} "THE TRIAL COURT ERRED BY DENYING DEFENDANT-APPELLANT'S MOTION FOR A NEW TRIAL."

{¶ 159} Under this assignment of error, Burton contends that the trial court erred by denying his motion for new trial. The motion was based on numerous grounds of alleged error that occurred during the trial. Burton's arguments regarding a new trial are based on Civ. R. 59(A)(1),(2),(4), (6), (7), and (9), which provide that a new trial may be granted for:

{¶ 160} "(1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;

{¶ 161} "(2) Misconduct of the jury or prevailing party;

{¶ 162} " * * *

{¶ 163} "(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

{¶ 164} " * * *

{¶ 165} "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

{¶ 166} "(7) The judgment is contrary to law;

{¶ 167} " * * *

{¶ 168} "(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application."

{¶ 169} We will not reverse the trial court's decision to grant or deny a motion for new trial absent an abuse of discretion. *Miller v. Remusat*, Miami App. No. 07-CA-20, 2008-Ohio-2558, at ¶32. (Citation omitted.) "An abuse of discretion means that the trial court's decision is unreasonable, arbitrary or unconscionable." Id., citing *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

{¶ 170} In the case before us, the trial court filed a one-line entry overruling the motion for new trial, and the motion for judgment notwithstanding the verdict. The trial court did not provide reasons for its decision.

{¶ 171} After reviewing the record in its entirely, we conclude that the trial court abused its discretion in denying the motion for new trial. The damage awards are excessive, and appear to have been awarded under the influence of passion or prejudice.

{¶ 172} "To support a finding of passion or prejudice under Civ.R. 59(A)(4), * * * [the

movant] must demonstrate that 'the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities.' * * * In assessing such a claim, a reviewing court should consider the amount of the verdict, whether the jury considered incompetent evidence, improper argument by counsel, or other improper conduct that can be said to have influenced the jury. * * * The granting of a new trial because the verdict is so excessive as to be the result of passion or prejudice rests in the trial court's discretion." *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 317. (Citations omitted.)

{¶ 173} " '[I]f "there is room for doubt whether the verdict was rendered upon the evidence, or may have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party." ' " *Harris v. Mt. Sinai Med. Ctr.*, 116 Ohio St.3d 139, 144, 2007-Ohio-5587, at ¶36. (Citations omitted.) "The amount of the verdict alone will not sustain a finding of passion or prejudice. There must be something contained in the record which the complaining party can point to that wrongfully inflamed the sensibilities of the jury." *Shoemaker v. Crawford* (1991), 78 Ohio App.3d 53, 65. Accord *Amerifirst Savings Bank of Xenia v. Krug* (1999), 136 Ohio App.3d 468, 500.

{¶ 174} In his brief, Burton raises the following items in support of his argument that the trial court abused its discretion in denying a new trial: opposing counsel's impermissible questions and comments during closing argument and during the punitive damages phase of the trial, which allegedly prejudiced the jury; opposing counsel's improper use of a recording and transcript during cross-examination; the trial court's instruction to Burton to answer questions; improper admission of hearsay statements; exclusion of evidence about

McDonald's sexual history and alleged drug use; the trial court's display of partiality toward plaintiffs; and the excessive jury award.

{¶ 175} As a preliminary matter, we find the evidence insufficient to support compensatory damages in the amount of $150,000. The alleged harassing remarks, while crude and uncalled for, took place on just two days, for a few hours, during McDonald's one-week residency in an apartment. On one of those days, McDonald returned of her own volition for the sole purpose of recording Burton, and a number of her comments appear to have been designed to elicit inappropriate remarks. The evidence of actual damages sustained by McDonald was minimal.

{¶ 176} McDonald's housing claims were brought under both R.C. 4112.02(H)(4) and 42 U.S.C. Section 3604, and the trial court instructed the jury that sexual harassment is a form of discrimination prohibited by state and federal laws. See Amended Complaint, Docket #102, ¶2 and Count II; Joint Pretrial Statement, Docket #109, p. 9, and Trial Transcript, Volume III, pp. 682-83. Immediately after making this statement, the trial court instructed the jury on sexual harassment with regard to both a hostile housing environment claim and a "quid pro quo" housing claim. Id. at 683-84.

{¶ 177} We note that Ohio has not yet recognized a hostile housing environment claim under R.C. Chapter 4112. See *Reid v. Plainsboro Partners, III*, Franklin App. Nos. 09AP-442, 09AP-456, 2010-Ohio-4373, at ¶26, citing *Ohio Civ. Rights Comm. v. Akron Metro Hous. Auth.,* 119 Ohio St.3d 77, 82, 2008-Ohio-3320. In *Arkon Metro*, the Supreme Court of Ohio held that landlords "may not be held liable under R.C. 4112.02(H)(4) for failing to take corrective action against a tenant whose racial harassment of another tenant created a

hostile housing environment." Id. at syllabus. The Supreme Court of Ohio also noted in *Akron Metro* that it had not yet decided whether a cause of action exists under R.C. 4112.02(H)(4), where a landlord allegedly creates a hostile housing environment through his own harassment. Id. at ¶8. The Supreme Court declined to address this issue. Id. In addition, we have not found any Ohio cases using the term "quid pro quo" sexual harassment in connection with R.C. 4112.04(H)(4).[1]

{¶ 178} Assuming that McDonald's claims were properly brought only under federal law, 42 U.S.C. Section 3604(b) provides that it is an unlawful practice:

{¶ 179} "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

{¶ 180} A number of federal circuits, including the Sixth Circuit Court of Appeals, have recognized a cause of action under Section 3604(b) for sexual harassment in housing. See, e.g., *Honce v. Vigil,* (C.A.10,1993), 1 F.3d 1085, 1089 (discussing Sixth Circuit authority), and *Krueger v. Cuomo* (C.A.7,1997), 115 F.3d 487, 491. The claim is based on "quid pro quo" harassment, or on the creation of a hostile housing environment. *Honce*, at 1089-90.

{¶ 181} " 'Quid pro quo' harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." Id. at 1089. (Citation omitted.) This theory

---

[1] Citing federal law, the Ohio Civil Rights Commission did apply hostile environment and "quid pro quo" harassment in a housing case in 2002. See *In the Matter of Ross v. Szerlip* (April 12, 2002), O.C.R.C. No. 8696, citing *Honce v. Vigil* (C.A.10,1993), 1 F.3d 1085. However, the Supreme Court of Ohio has not yet recognized such causes of action under Ohio's civil rights law. Burton has not raised these issues, however, and we need not resolve them for purposes of this appeal. We

"applies only when a defendant demands sexual favors in exchange for favorable treatment." *Cavalieri-Conway v. L. Butterman & Assoc.* (N.D. Ill.,1998), 992 F.Supp. 995, 1007, citing *Mary M. v. North Lawrence Community School Corp.* (C.A. 7, 1997), 131 F.3d 1220.

{¶ 182} In contrast, a hostile housing environment claim "is actionable when the offensive behavior unreasonably interferes with use and enjoyment of the premises. The harassment must be 'sufficiently severe or pervasive' to alter the conditions of the housing arrangement. * * * It is not sufficient if the harassment is isolated or trivial." *Honce*, at 1090. (Citations omitted.)

{¶ 183} "The terms 'quid pro quo' and 'hostile work environment' serve to distinguish roughly between cases in which threats are carried out ( quid pro quo) and cases in which threats are not carried out or are absent altogether (hostile work environment)." *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 723, citing *Burlington Industries, Inc. v. Ellerth* (1998), 524 U.S. 742, 751-55, 118 S.Ct. 2257, 141 L.Ed.2d 633.[2]

{¶ 184} 42 U.S.C. Section 3613(a)(1)(a) authorizes civil actions to be brought in state or federal court to redress alleged discriminatory housing practices. Permissible relief is governed by Section 3613(c)(1), which states that:

{¶ 185} "In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d) of this section, may grant

mention the point only for purposes of clarity, because potential damages might differ depending on the type of action being pursued.

[2]Under this distinction, the case before us does not fit within the "quid pro quo" definition — Burton did not condition McDonald's continued tenancy or the repairs to her apartment on her acquiescence to sexual demands. He also did not evict her when she rejected his advances.

as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)."

{¶ 186} The statute does not define "actual" damages, but courts have held that " '[a] damages action under the statute sounds basically in tort – the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach.' " *Samaritan Inns, Inc. v. District of Columbia* (C.A.D.C., 1997), 114 F.3d 1227, 1234, quoting from *Curtis v. Loether* (1974), 415 U.S. 189, 195, 94 S.Ct. 1005, 39 L.Ed.2d 260. As a general rule, " 'A person to whom another has tortiously caused harm is entitled to compensatory damages therefor if, but only if, he establishes by proof the extent of such harm and the amount of money representing adequate compensation with such certainty as the nature of the tort and the circumstances permit.' " *Lovelady v. Rheinlander* (1940), 66 Ohio App. 409, 415, quoting from 4 Restatement of the Law of Torts, 574, Section 912. Accord *Quinter v. Soifer* (Aug. 12, 1981), Miami App. No. 80-CA-57.

{¶ 187} In the case before us, McDonald stated that she lost her $200 deposit and the ability to live in an apartment located near her grandparents. McDonald also testified that she was humiliated, embarrassed, and upset by Burton's conduct, and could not sleep at night with the lights off. During a period of more than two years after she left the apartment, however, she had not seen a counselor or therapist about these issues.

{¶ 188} In a case involving similar conduct towards a tenant, the jury awarded the tenant one dollar compensatory damages for hostile environmental sexual harassment and $450 for quid pro quo sexual harassment, which reflected the amount of the tenant's security

deposit. *Cennamo v. Deem*, Knox App. No. 02 CA 22, 2002-Ohio-7189, at ¶4.[3] The fact that these damages were awarded in another case does not mean that similar amounts should have been awarded in the case before us. But, McDonald failed to present evidence to justify the large amount of the award, particularly since we conclude, infra, that McDonald failed to prove a quid pro quo harassment housing claim.

{¶ 189} McDonald was also awarded $50,000 on her employment discrimination claim. According to the amended complaint, this claim was brought pursuant to R.C. 4112.99. Docket #102, p. 7. The joint pre-trial statement indicates that McDonald's employment claim was based on a violation of R.C. 4112.02. Docket # 109, p. 10. Regarding this claim, the jury was instructed on both quid pro quo sexual harassment and hostile sexual environment. The jury awarded zero damages for the quid pro quo claim, and $50,000 for the hostile sexual environment claim.

{¶ 190} R.C. 4112.02 provides that:

{¶ 191} "It shall be an unlawful discriminatory practice:

{¶ 192} "(A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶ 193} R.C. 4112.01 states, in pertinent part, as follows:

---

[3] *Cennamo* appears to have been brought under federal law. R.C. Chapter 4112 and the Ohio Civil Rights Commission are not mentioned in the case.

{¶ 194} "(A) As used in this chapter:

{¶ 195} " * * *

{¶ 196} "(2) 'Employer' includes the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer."[4]

{¶ 197} McDonald's claim was brought pursuant to R.C. 4112.99, which provides that "[w]hoever violates this chapter [R.C. Chapter 4112] is subject to a civil action for damages, injunctive relief, or any other appropriate relief." The Supreme Court of Ohio has held that the word "damages" in R.C. 4112.99 includes both compensatory and punitive damages.

---

[4]The evidence was not clear on the question of whether Burton employed four or more persons within the state and fit within the definition of an "employer" under R.C. 4112.01. The testimony indicated that on one day (Tuesday), both McDonald and her sister worked with Burton, and two other tenants or prospective tenants, Angela Bentley and Richard Allison. McDonald's sister never worked thereafter. On the second day that McDonald worked (Wednesday), Angela Bentley and Richard Allison, helped Burton and McDonald clean and paint an apartment. No evidence was offered regarding the terms and condition of these individuals' employment and whether they were independent contractors or employees. In addition, no evidence was offered regarding whether Bentley and Allison had worked for Burton before or after that day, and Burton denied that he had any employees. Burton also paid his girlfriend, Francis Ledford, to work for him occasionally, but no evidence was presented to indicate that Ledford was actually employed during the time-frame of the alleged harassment.

If Burton is not an employer as defined by R.C. 4112.01, the remedies in Chapter 4112 would not be available. *Collins v. Rizkana,* 73 Ohio St.3d 65, 74, 1995-Ohio-135. The Supreme Court of Ohio indicated in *Collins* that where employers have insufficient numbers of employees for purposes of R.C. 4112.01, employees who have been sexually harassed will be permitted to bring a common law action for wrongful discharge in violation of public policy. Id. at 74. In the case before us, a claim for wrongful discharge was not pled in the amended complaint and was not mentioned in the pretrial statement. The jury also was not instructed on the tort of wrongful discharge in violation of public policy. Burton has not raised these issues, however, and we do not base our decision on a failure of proof that Burton was an employer for purposes of R.C. 4112.99.

*Rice v. CertainTeed Corp.* 84 Ohio St.3d 417, 418, 1999-Ohio-361. In *Berge*, supra, the Tenth District Court of Appeals interpreted this to "generally include direct pecuniary loss, such as hospital and other medical expenses immediately resulting from the injury, or loss of time or money from the injury, loss due to the permanency of the injuries, disabilities or disfigurement, and physical and mental pain and suffering." 136 Ohio App.3d 281, at 319.

{¶ 198} "[A]n employment discrimination award is designed to restore victims to the economic position that they would have enjoyed, but for the discrimination." *Ohio Civ. Rights Comm. v. David Richard Ingram, D.C., Inc.*, 69 Ohio St.3d 89, 92, 1994-Ohio-515. Back pay is intended to accomplish this by placing employees in the position they would have enjoyed absent violation of the employment contract. (Citation omitted.) *Jordan v. Ohio Civ. Rights Comm.*, 173 Ohio App.3d 87, 2007-Ohio-3830, at ¶43, citing *Stacy v. Batavia Local School Dist. Bd. of Edn.*, 105 Ohio St.3d 476, 2005-Ohio-2974, at ¶26.

{¶ 199} "In order to recover back pay, a plaintiff has a duty to mitigate. *Ford Motor Co. v. E.E.O.C.* (1982), 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721. 'Interim earnings or amounts earnable with reasonable diligence * * * shall operate to reduce the back pay otherwise allowable.' * * * 'This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he [lost].' * * *

{¶ 200} "Front pay is 'the monetary equivalent of reinstatement, to be given in situations where reinstatement is impracticable or impossible.' *Kramer v. Logan Cty. School*

*Dist. No. R-1* (C.A.8, 1998), 157 F.3d 620, 626. Front pay is awarded only 'where reinstatement is inappropriate and the plaintiff has been unable to find another job, in order to "make victims of discrimination whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment." ' * * * As with back pay, in order to recover front pay, the plaintiff has the duty to exercise reasonable diligence in mitigating damages by seeking alternative employment." *Jordan*, 2007-Ohio-3830, at ¶43-44. (Citations omitted.)

{¶ 201} The trial judge instructed the jury that McDonald was entitled to recover lost wages and benefits from the date of her discharge, until the date of verdict, with deductions for the amount of wages and benefits received from replacement income during the period of back pay awarded. The court also told the jury to consider an award of front pay, which would include the amount McDonald would have earned from the date of the verdict until the date her loss of income and benefits would cease.

{¶ 202} The case before us presents a different scenario from the usual employment discrimination situation, because the evidence indicates that employment was contemplated to be very short-term and part-time, while McDonald was between jobs. Trial Transcript, Volume II, pp. 399 and 447. For example, McDonald stated that she had talked to Burton about doing work for him *until she started at Speedway*, to help supplement. Id. at 447. (Italics added.) Burton was paying McDonald $8.00 an hour, and there were no benefits.

{¶ 203} When McDonald moved into the apartment, she had just quit her job at Infocision, and was scheduled to start the job at Speedway within a few weeks, making $7.85 an hour. Because long-term employment with Burton was never contemplated, it is hard to

see how more than a few weeks' pay would be warranted as damages.

{¶ 204} The job at Speedway would be part-time until McDonald finished training, which would be about two weeks. McDonald decided not to take the Speedway job, allegedly because she was afraid of Burton, who lived nearby. About two weeks after turning down the Speedway job, McDonald found another job at Cassano's as a shift manager. McDonald worked at Cassano's for about a month and quit that job because she was afraid of being there late at night.

{¶ 205} Assuming for the sake of argument that Burton would continue to have employed McDonald after she started the job at Speedway (and no evidence was presented to demonstrate that), McDonald demonstrated a potential loss of some uncertain amount of part-time work for approximately two weeks, which is when McDonald began her job with Cassano's. Even if one could manufacture some sort of agreement to employ McDonald for more than a limited time (and there is no evidence of that), and even if one could assume that McDonald's departure from Cassano's was related to Burton's acts, the most that could be found is that McDonald lost some unproven amount of part-time work from that point until she became employed in the candle-selling business with her fiancé. At trial, which took place in late July 2009, McDonald stated that she and her fiancé had been employed full-time in that job, seven days a week for the past year and a half, that she was happy in the job, and that while her income could always be better, she would probably not turn down the income from that job to go back to Speedway. The incidents involving Burton took place in April 2007, and McDonald's employment in the candle business would have begun around February 2008, which was about ten months later.

{¶ 206} The only reasonable inference to be drawn is that McDonald was employed in a position that was comparable to the job with Burton, and to the job at Speedway. Therefore, front pay would not have been appropriate. Furthermore, even if back pay is considered, despite the lack of evidence that it was merited, the outside time-period could possibly have been at nine months, at most, figuring in the employment at Cassano's, and making the assumptions stated above – which assumptions are not warranted by the evidence. The jury's award of $50,000 was clearly excessive.

{¶ 207} The damages awarded to FHAA also are excessive. FHAA's executive director, Vincent Curry, testified that he had expended 26 hours in relation to the case, and valued his time at $140 per hour, for a total of $3,640. In closing argument, FHAA's counsel, who also served as McDonald's counsel, asked for an additional $15,000 for "a frustration of purpose element," in that Curry had "more work to do" because of this case. Trial Transcript, Volume III, p. 629. The jury awarded $18,640, which represents the sum requested.

{¶ 208} At the time the claims against Burton were tried, FHAA had previously been denied standing in another case to pursue claims under R.C. Chapter 4112, because Ohio's Fair Housing Law provided for enforcement by the Ohio Attorney General rather than private agencies, and because R.C. Chapter 4112 did not define "aggrieved persons" or those who were authorized to file suit, to include private organizations like FHAA. See *Fair Hous. Advocates Assn., Inc. v. Chance*, Wayne App. No. 07CA0016, 2008-Ohio-2603, ¶9-15.[5] The court in *Chance* rejected FHAA's claim that it had suffered an "injury-in-fact" because its

---

[5] R.C. Chapter 4112 was amended in 2009 to include organizations as "persons" who can be "aggrieved persons" for purposes of enforcing R.C. 4112.02(H) by filing civil actions under R.C. 4112.051(A)(1). See *Housing Advocates, Inc. v. Berardi & Partners, Inc.*, No. 1:10–CV–790 (N.D.Ohio Nov. 29, 2010).

investigation of a complainant's allegations had "reduced its resources available to conduct other activities, thereby impairing those activities." Id. at ¶6.

{¶ 209} Federal courts have, however, allowed standing to private organizations under the federal Fair Housing Act, based on allegations that the organizations' resources were diverted. See, e.g., *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers* (C.A.3,1998) 141 F.3d 71, 78 (discussing bare allegations of diversion of resources, which may withstand motions to dismiss for lack of standing, and proof of alteration of organization's operations that is required to withstand motion for summary judgment based on lack of standing). Federal appellate courts generally agree that "where an organization alleges or is able to show – depending on the stage of the proceeding – that it has devoted additional resources to some area of its effort in order to counteract discrimination, the organization has met the Article III standing requirement." Id.

{¶ 210} Circuit courts differ, however, about the extent to which injury related to litigation will be considered in deciding standing. A more restrictive view is that "to show standing, an organization must demonstrate that it suffered a concrete injury that is completely independent from the economic and non-economic costs of the litigation." *Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.* (C.A. 6, 2006), 210 Fed. Appx. 469, 474. (Citations omitted). Other circuits, including the Sixth Circuit Court of Appeals, "take a more lenient approach, allowing organizations to prove standing by showing that they diverted resources toward litigation to counteract the defendant's housing discrimination." Id. (Citations omitted). The Sixth Circuit reluctantly concluded in *Village of Old St. Andrews* that it was bound by its prior decision in *Hooker v. Weathers* (C.A. 6, 1993), 990 F.2d 913,

which had followed the more lenient approach.   Id. at 474-76.

{¶ 211} The fact that standing may exist does not mean that a claim for damages has been sustained.   In the case before us, the only evidence offered was that Curry had expended a number of hours, the value of which he estimated at $3,640, for investigating the incident. Curry did not offer proof as to any other expenses FHAA had sustained for diversion of resources or frustration of mission.   Compare  *Fair Housing of Marin v. Combs*  (C.A.9, 2002), 285 F.3d 899, 906 (affirming district court's award of damages to fair housing agency, where district court had made specific findings of fact on the issue).   The court of appeals noted that the record supported standing and the award of damages, because the fair housing agency had itemized its claim for diversion of resources, and in addition, had expended $10,160 for design, printing, and dissemination of literature aimed at redressing the impact the defendant's discrimination had on the Marin housing market.   Id. at 905-06.

{¶ 212} In *Combs*, the federal district court had noted that:

{¶ 213} "A fair housing organization may suffer redressable injury to its 'non-economic interest in encouraging open housing', or frustration of mission. * * *  To recover, a fair housing organization must establish that expenditures in education, counseling and/or outreach are necessary to counterbalance the effects of a defendant's discriminatory practices."   *Fair Housing of Marin v. Combs* (March 29, 2000), N.D. Cal. No. C 97-1247-MJJ, 2000 WL 365029, *4, citing *Spann v. Colonial Village, Inc*. (D.C. Cir. 1990), 899 F.2d 24, 28-29. (Other citation omitted.)

{¶ 214} FHAA failed to present any evidence of expenditures of this sort in the case before us, and there was no basis for a jury award compensating for diverted resources or

frustration of purpose. Accordingly, the award to FHAA was clearly excessive.

{¶ 215} An excessive verdict standing alone, however, does not support a finding of passion or prejudice; the record must demonstrate that something wrongfully inflamed the jury's sensibilities. *Shoemaker*, 78 Ohio App.3d at 65. Burton points to various items, including impermissible questions and cross-examination techniques by opposing counsel, the trial court's instructions to Burton and display of partiality toward plaintiffs, improper admission of hearsay statements, and exclusion of evidence about McDonald's sexual history and drug use.

{¶ 216} Burton first points to counsel's description of Burton as a "sexual predator" during closing argument on punitive damages, and as a liar during closing argument on liability. Plaintiff's counsel also referred to McDonald as a "sweet person" and called his clients "his heroes."

{¶ 217} "Generally, trial counsel is entitled to considerable latitude in the presentation of closing argument. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph two of the syllabus. The Supreme Court of Ohio has recognized, however, that abusive remarks and tactics can undermine the fairness of the trial and that the trial judge has a duty 'to see that counsel do not create an atmosphere which is surcharged with passion or prejudice and in which the fair and impartial administration of justice cannot be accomplished.' *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d 495, 721 N.E.2d 1011 * * * 'When argument spills into disparagement not based on any evidence, it is improper.' " *Edwards v. Ohio Inst. of Cardiac Care*, 170 Ohio App.3d 619, 638, 2007-Ohio-1333, at ¶80. (Citations omitted.)

{¶ 218} Furthermore, while "counsel may not make unwarranted attacks on a witness's character, it is not improper to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization." Id. at ¶85.

{¶ 219} Counsel for McDonald and FHAA commented several times during closing argument about the fact that Burton had lied. Our review of the record indicates that the evidence reasonably supports this characterization, because Burton made statements that contradicted his prior deposition testimony and his recorded statements. Burton's demeanor as a witness did nothing to help his case. Nonetheless, the remarks about Burton being a sexual predator and counsel's insertion of his opinions about the character of his own clients were improper. While these remarks might not have been sufficient to warrant a new trial based on passion and prejudice, the combination of these items, the admission of certain evidence to which objection was made, and the trial court's comments in front of the jury indicate that the jury's verdict was influenced by passion and prejudice.

{¶ 220} In *Kaffeman v. Maclin,* 150 Ohio App.3d 403, 2002-Ohio-6479, the Eighth District Court of Appeals reversed a verdict for the plaintiff and remanded for a new trial, stating that "[b]ecause it is impossible to assess the prejudicial effect of the trial judge's conduct on the proceedings, there is simply no way that any review of this matter can render satisfaction that justice was done." Id. at ¶22. See, also *Bambeck v. Berger*, Cuyahoga App. No. 89597, 2008-Ohio-3456. In *Bambeck*, the appellate court observed that:

{¶ 221} "The trial court made one inappropriate comment after another in the presence of the jury. The record is replete with evidence of the lower court's bias against appellant in this matter, preventing a fair and impartial proceeding. Accordingly, the validity of the entire

trial, including the decisions made by the trial court on evidentiary issues, has been drawn into question. Because it is impossible to assess the prejudicial effect of the trial judge's conduct on the proceedings, there is simply no way that any review of this matter can produce satisfaction that justice was done." Id. at ¶17.

{¶ 222} In the opening statement, Burton's defense counsel indicated that this case was about money. The trial court did not rule on an objection to this statement. Subsequently, defense counsel stated that the plaintiffs wanted "lots of money," and the trial court, without an objection before it, said, in front of the jury, that while the lawsuit was about money, "the implication the Counsel here has done something inappropriate is not correct." Trial Transcript, Vol. I, p. 31. Subsequently, in chambers, the trial court stated that it was highly offended by the defense argument. The court noted that Burton's counsel's argument:

{¶ 223} " * * * indicts the whole system. * * * It says that I as part of the system would allow that. Uh, it says that these lawyers have somehow acted unethically. It accuses them of unethical behavior. It's the type of argument that I find highly, highly, highly offensive, and it's not the kind of thing that a jury ought to leave here with that type of impression." Id. at pp. 46-47.

{¶ 224} After these remarks occurred, the plaintiffs called Burton as their first witness, on cross-examination. Shortly after Burton began testifying, defense counsel objected to plaintiff's counsel's instruction to Burton to give "yes" or "no" answers. Burton's counsel argued that plaintiff's counsel was improperly instructing the witness. The trial court overruled the objection, stating that, "What he's [plaintiff's counsel] is trying to do is help your witness avoid those kinds of conflicts." Id. at p. 59. At this point, however, there were

no "conflicts," as Burton had simply agreed with a statement that plaintiff's counsel had made.

{¶ 225} Subsequently, defense counsel objected to the form of a question that was asked, and the trial court stated, "Well, the problem is the answers. Overruled." Id. at p. 74.

{¶ 226} At pp. 139-140, plaintiffs' counsel questioned Burton about a statement he had made during the taped conversation. Burton was asked if he had said, "You'll probably say I sexually harassed you. All the others do." Id. at p. 139. Burton stated that he did not make the statement in that context. Id.

{¶ 227} The questioning about whether Burton had harassed other women continued, and Burton's counsel objected, asking that the tape-recording of the remarks be played. This was not allowed, and plaintiffs' counsel continued to examine Burton about whether he had made this statement, with Burton responding that counsel was using only three words from the statement. The following exchange then occurred:

{¶ 228} "MARGOLIUS: Let me make it clear here. Were these your words 'all the women do'?

{¶ 229} "BURTON: In a secret tape recording not knowing I'm being recorded.

{¶ 230} "MARGOLIUS: Right. Did she force you to say 'all the women do'? Did she force you to use that language?

{¶ 231} "BURTON: There's been no other women, sir.

{¶ 232} "BRANNON: I'm going to object, your Honor. It's obviously [unintelligible] that said that. That's what it says. He's really taking it out of context. The question's not in good faith, not one of good faith.

{¶ 233} "COURT: And your objection is not in good faith. Overruled." Id. at p.

143.

{¶ 234} After reviewing the relevant portion of the tape recording, we conclude that plaintiffs' counsel's questions did take Burton's remarks out of context. What Burton was indicating at that point in the tape-recording was that in his experience, when women did not pay their rent and were evicted, they claimed sexual harassment in order to avoid liability. Burton also indicated that no women had pressed charges against him, that there was no substance to any such contentions, but that falsely claiming harassment was what women do. Regardless of whether one agrees with Burton's viewpoint, his comments were taken out of context, and defense counsel's objection was not in bad faith. The trial court's remarks, however, gave the jury a very negative impression of Burton's attorney and, by extension, Burton. The trial court did subsequently allow the entire statement to be read to the jury, but this would not have vitiated the impression created by the court's remark.

{¶ 235} At other points, when Burton's counsel objected to questions, the trial court made remarks like, "Ah, it's common sense. Overruled." Id. at pp. 74. The trial court also allowed Burton to be questioned about statements he made during the OCRC proceedings. Id. at p. 123. In addition, the trial court let plaintiffs question Burton, over objection, regarding a newspaper headline which stated, "Commission finds merit to tenant's harassment claims." Id. at p. 236. Subsequently, when defense counsel attempted to question Burton about something he had been told by an OCRC representative during the conciliation process, the trial court told defense counsel, again in front of the jury, that it "would violate the statute. You know that, and I know that." Id. at p. 345. When defense counsel said that he did not believe the question violated the statute, the trial court stated, "Yes, it does. You want me to

get it for ya?"   Id.

{¶ 236} R.C. 4112.05(B)(5) does preclude the use in subsequent hearings or other proceedings   of anything said or done during informal methods of conciliation or conference with the OCRC.   In *Hanson v. Ohio Edison* (Jan. 10, 1996), Summit App. No. 17169, the Ninth District Court of Appeals concluded that the trial court did not abuse its discretion in handling evidence, where the trial court had refused to let the plaintiff refer to investigative reports and findings of the OCRC.   The trial court had concluded that these matters were hearsay and were highly prejudicial to the defendant.   See, also *Mowery v. Columbus*, Franklin App. No. 05AP-266. 2006-Ohio-1153, at ¶65 (concluding that the trial court properly excluded an Equal Employment Opportunity report prepared by the defendant, the City of Columbus).   In this regard, the Tenth District Court of Appeals noted that:

{¶ 237} "While we find the EEO Report probative, we find that the potential for unfair prejudice to appellees and confusion of the issues before the jury substantially outweighs its probative value. The EEO Report contains lengthy discussions of and conclusions regarding Mowery's claims of disparate treatment and retaliation, which were not before the jury. Additionally, the EEO Report presents a substantial danger of jury confusion based on the interplay of the EEO Report's conclusion of probable cause and the jury's responsibility to independently evaluate the evidence under the trial court's instructions of law to determine whether the evidence demonstrates a violation of R.C. 4112."   Id.

{¶ 238} In the case before us, the trial court erred when it initially allowed plaintiffs to ask Burton about the finding of probable cause.   Once plaintiffs chose to pursue this evidence and it had been presented to the jury, defense counsel did not act improperly by attempting to

introduce other evidence on the same subject. The trial court's implication, again, was that Burton's counsel was acting in bad faith.[6]

{¶ 239} Another example of insertion of the court into the proceedings occurred when the court took over questioning of Burton. When defense counsel objected, the court said, "I apologize, Mr. Brannon .... I've taken three recesses, the jury has had enough." Trial Transcript, Volume II, p. 359. Afterward, the court told the jury that "Um, sometimes in the course of the proceedings, you will get frustrated, including me .... but that frustration is not part of the trial. It's not part of the case, um, and you shouldn't interpret it in any way than an effort on behalf of the Court to move the case along." Id. at p. 360. Nonetheless, the damage was done, particularly in light of the court's prior remarks.

{¶ 240} The trial court also allowed Vincent Curry to testify, over objection, about his conversation with another female who believed that Burton had sexually harassed her. Id. at p. 520. This testimony was clearly hearsay – the individual was never called to testify at trial.

---

[6] We are aware that plaintiffs questioned Burton about the newspaper article in an attempt to show that Burton improperly retaliated against Vincent Curry by filing a defamation action based on the content of the article. However, plaintiffs could have questioned Burton about Curry's remarks without referring to the OCRC finding of probable cause. Eliciting this testimony from Burton, and Curry's improper insertion of the probable-cause finding again during his own testimony, when he was not asked about it, could be considered "a not-too-subtle attempt to end-run" the Rules of Evidence, which balance relevance and prejudice in deciding whether to admit evidence. *EEOC v. Ford Motor Co.* (C.A.6, 1996), 98 F.3d 1341, unpublished opinion, 1996 WL 557800, *10. See, also, *Alexander v. CareSource* (C.A.6, 2009), 576 F.3d 551, 562. In *Johnson v. Yellow Freight System, Inc.* (C.A.8, 1984), 734 F.2d 1304, the Eighth Circuit Court of Appeals observed that "[b]ecause substantial evidence was presented to the jury on all matters summarized in the [EEOC] report, there is little probative value in the EEOC's conclusory statements regarding the same evidence. To admit the report under these circumstances would amount to admitting the opinion of an expert witness as to what conclusions the jury should draw, even though the jury had the opportunity and the ability to draw its own conclusions from the evidence presented regarding disparate treatment." Id. at 1309.

Subsequently, the trial court reversed its position, sustained an objection to further testimony about the conversation, and gave an instruction that attempted to cure the error. Id. at 520-21. Again, the damage had been done.

{¶ 241} During the testimony of the final defense witness, the trial court overruled a defense motion to allow the jury to hear testimony about a "pot pipe" that was seen in McDonald's apartment. In response to the defense assertion that the testimony should be allowed to buttress Burton's credibility, the trial court responded that Burton "sank his ship so long ago." Id. at p. 573. The comment was not made to the jury, but was voiced during a sidebar conference.

{¶ 242} Subsequently, at the end of the trial, defense counsel objected to the court's display of a dislike or distrust of Burton in chambers and in court, and to the court's having taken an advocacy role on behalf of the plaintiff. Id. at pp. 584-85. The court overruled the objections, after stating that Burton was probably the worst witness he had ever seen, and that Burton had brought the problem on himself. The trial court subsequently overruled Burton's motion for judgment notwithstanding the verdict, and his motion for a new trial, without addressing any of the arguments therein.

{¶ 243} As a final matter, Burton contends that the motion for new trial should have been granted because the trial court improperly excluded evidence relating to McDonald's sexual history, including a prior rape and numerous sexual partners. This evidence was offered to establish that Burton's discussions were not offensive to McDonald, and to show that McDonald's prior rape caused McDonald's alleged emotional distress.

{¶ 244} The United States Supreme Court has held that a "complainant's sexually

provocative speech or dress" can be relevant in "determining whether he or she found particular sexual advances unwelcome." *Meritor Sav. Bank, FSB v. Vinson* (1986), 477 U.S. 57, 69, 106 S.Ct. 2399, 2406-07, 91 L.Ed.2d 49. In addition, courts have allowed evidence of other sources of psychological stress where a party alleges emotional distress resulting from sexual harassment. For example, in *Spina v. Forest Preserve of Cook Cty.* (Nov. 23, 2001), N. D. Ill. No. 98 C 1393, 2001 WL 1491524, the court stated that "despite Dr. Nancy Baker's deposition testimony that Officer Spina's emotional distress resulted solely from the harassment, the Defendants are entitled to challenge that conclusion at trial. Specifically, a jury would likely find relevant the fact that, in addition to the harassment, Officer Spina's boyfriend committed suicide in their home and Officer Spina learned of a troubling gynecological symptom prior to her decision to seek psychiatric counseling." Id. at *9.

{¶ 245} Federal courts have also permitted independent psychological examinations where a plaintiff has alleged emotional distress in sexual harassment cases. See *Dibrito v. Harrisburg Area Community College* (Mar. 12, 2010), M.D. Pa. No. 1:08-CV-2308, 2010 WL 936236, *1 (requiring plaintiff to submit to examination on these issues: "(a) whether, and the extent to which, plaintiff is currently suffering from emotional distress or mental injury; * * * whether plaintiff's alleged emotional distress is attributable to defendant's conduct or to other factors (including pre-existing mental health issues); and (c) to what extent any of plaintiff's alleged emotional distress which is attributable to defendant has exacerbated plaintiff's pre-existing physical or mental conditions.")

{¶ 246} In the case before us, Burton was precluded from inquiring about a sexual assault that may have been relevant to McDonald's claim of emotional distress. According to

the proffer, the alleged assault occurred when McDonald was fifteen years old, a time that was not too distant from the incidents that occurred when she was twenty years of age.

{¶ 247} Each of the various matters referred to above, had it occurred in isolation, might not justify a conclusion that a new trial should be ordered. However, as in *Kaffeman*, with the cumulation of these matters, there is "no way that any review of this matter can render satisfaction that justice was done." 2002-Ohio-6479, at ¶22. Accordingly, we conclude that the trial court erred when it overruled Burton's motion for a new trial.

{¶ 248} Burton's Second Assignment of Error is sustained.

III

{¶ 249} Burton's Third Assignment of Error is as follows:

{¶ 250} "THE TRIAL COURT ERRED BY DENYING DEFENDANT-APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT."

{¶ 251} Under this assignment of error, Burton contends that the trial court erred in denying his motion for judgment notwithstanding the verdict, because Burton's conduct was not severe or pervasive enough to support liability. In this regard, Burton makes the following arguments: (1) a few hours of discussion about sex, interspersed with work matters, is insufficient to support liability for a hostile environment claim, particularly where McDonald's acts were designed to lead Burton into making offensive comments; (2) there was no evidence of quid pro quo sexual harassment, because Burton never told McDonald that he would evict her if she refused to have sex with him; (3) the evidence is insufficient to support an award of damages; and (4) the evidence is insufficient to support a finding that McDonald

was Burton's employee.

**{¶ 252}** The Supreme Court of Ohio has articulated the following standards for granting judgment notwithstanding the verdict:

**{¶ 253}** "The standard for granting a motion for j.n.o.v. is the same as that necessary to sustain a motion for a directed verdict. * * * As we set forth in *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (74 O.O.2d 427]:

**{¶ 254}** " ' * * * The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.' " *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 137. (Citation omitted.)

**{¶ 255}** We hold, in Part II, above, that the damage awards are excessive and appear to have been influenced by passion or prejudice. That does not mean, however, that McDonald and FHAA failed to prove any damages. Based on McDonald's own testimony, she had a limited expectation of further work, at most until she began her job with Speedway, and this would have merited at least a minimal award of damages. FHAA also presented evidence of minimal damages.

**{¶ 256}** Regarding Burton's argument about the lack of severity of the alleged harassment, we note that:

**{¶ 257}** "In order to establish a claim of hostile-environment sexual harassment, the

plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the 'terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment,' and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action."   *Hampel v. Food Ingredients Specialties, Inc*., 89 Ohio St.3d 169, 170, 2000-Ohio-128, paragraph two of the syllabus.

{¶ 258} The United States Sixth Circuit Court of Appeals has stressed that:

{¶ 259} "Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is 'quintessentially a question of fact.' * * * To determine whether a work environment is 'hostile' or 'abusive,' courts look at the totality of the circumstances. * * * The factfinder must evaluate the conduct at issue by both an objective and subjective standard. * * * This requires a plaintiff to establish both that the harassing behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive."   *Hawkins v. Anheuser-Busch, Inc*. (C.A.6, 2008), 517 F.3d 321, 333. (Citations omitted.)

{¶ 260} Whether sexual harassment is severe or pervasive enough "is not susceptible to a 'mathematically precise test.' " Id. (Citation omitted.)   "Conduct that is merely offensive is not actionable. * * * To be actionable, the harassment must consist of more than words that simply have sexual content or connotations. * * * Instead, the workplace must be permeated

with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment." Id. (Citations omitted).

{¶ 261} In *Harris v. Forklift Systems, Inc.* (1993), 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295, the United States Supreme Court provided a non-exhaustive list of factors, including:

{¶ 262} "[T[he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required."

{¶ 263} It is true that the alleged sexual harassment in the case before us took place on only two occasions before McDonald ended the employment relationship, and that most situations involving hostile environment claims take place over longer periods of time. For example, in *Harris*, the harassment continued throughout the plaintiff's employment of more than a year and a half. 510 U.S. at 19. However, construing the facts in McDonald's favor, as is required, the offensive conduct occurred on two of the three days that McDonald worked, and she had no reason to believe it would not have continued to occur. Furthermore, the Sixth Circuit has "made clear that harassment involving an 'element of physical invasion' is more severe than harassing comments alone." *Hawkins*, 517 F.3d at 333, citing *Williams v. Gen. Motors Corp.* (C.A. 6, 1999), 187 F.3d 553, 563.

{¶ 264} In the case before us, McDonald testified that Burton had touched her

inappropriately and that she found it highly offensive. While Burton denied this, the evidence, construed in McDonald's favor, is sufficient to support a claim that the alleged harassment was severe or pervasive.

{¶ 265} With regard to the quid pro quo sexual harassment claim, however, we conclude that Burton's comments in the transcript would not lead a reasonable person to conclude that Burton conditioned McDonald's continued tenancy in her apartment on sexual favors. In fact, Burton stressed several times that regardless of any relationship between them, he would evict McDonald if she failed to pay rent, because that was a business situation.

{¶ 266} McDonald contends that reducing rent and conditioning repairs in exchange for sex are classic examples of quid pro quo sexual harassment. McDonald also maintains that Burton subtly threatened McDonald by injecting sex into his conversations about evicting her and holding her accountable for a year's lease. Finally, McDonald notes that Burton procrastinated and never did fix her door properly. The cases cited by McDonald to support this theory involve facts distinguishable from those in the case before us. For example, in *Greiger v. Sheets* (Apr. 10, 1989), N. D. Ill. No. 87 C 6567, the landlord promised to make several repairs when the lease was signed. Subsequently, the landlord asked the tenant for sex, and she refused. The landlord then told the tenant that because she had not agreed to have sex with him, she would get the repairs "when she got them." Several repairs were never done, and some were delayed. The trial court concluded that this was a showing sufficient to withstand summary judgment on the quid pro quo harassment claim.

{¶ 267} In *Richards v. Bono* (May 2, 2005), M.D. Fla No. 5:04CV484-OC-10GRJ, 2005 WL 1065141, also cited by McDonald, the court concluded that "consistent with the

purpose and language of the Fair Housing Act, that where the terms and conditions of a rental, including continued occupation, rent, and the provision of repairs, are conditioned upon compliance with the sexual demands of a landlord, then sexual activity has become part of the terms and conditions of the rental, and the landlord is liable for sex discrimination under § 3604(b)."  Id. at *5.  The court, therefore, overruled the defendant's motion to dismiss the quid pro quo sexual harassment claim, because the complaint contained allegations indicating that the landlord raised the rent when it became clear that the plaintiff was not going to acquiesce to his sexual demands.  Id.

{¶ 268} *U.S. v. Koch* (D. Neb., 2004), 352 F.Supp.2d 970, the final case cited by McDonald, is simply cited for the general proposition that reducing rent and exchanging repairs in exchange for sex are classic examples.  *Koch* involved a landlord who was alleged to have committed various acts, including evicting a tenant after she refused his proposition to cancel her overdue rent in exchange for sex, and evicting another tenant after she refused his request for oral sex.  Id. at 981.

{¶ 269} Construing the evidence in favor of McDonald, there is no substantial evidence to support her side of the quid pro quo housing claim, upon which reasonable minds may reach different conclusions.  In contrast to the cited cases, Burton never took any housing actions in response to McDonald's rejection of his overtures.  He never attempted to evict McDonald and never conditioned repairs on her acquiescence to sexual demands.  While Burton may not have repaired the door to McDonald's satisfaction, there is no evidence that his actions were the result of her rejection.  In fact, even after McDonald allegedly rejected Burton's overtures on Wednesday, he provided her with a door brace and mace, because she

complained about having trouble with a boyfriend. And, after McDonald rejected Burton's advances on Friday, Burton never saw McDonald again until after the lawsuit had been filed. Accordingly, we conclude that the trial court erred in failing to grant Burton's motion for judgment notwithstanding the verdict on the quid pro quo housing harassment claim.

{¶ 270} Burton's final argument is that the evidence was insufficient to support a finding that McDonald was Burton's employee, because McDonald received no benefits, set her own hours, was not supervised while she was cleaning, and was retained to perform specific tasks with no expectation of continued work.

{¶ 271} R.C. 4112.01 defines both "employer" and "employee." An employer is one who employs four or more persons within the state. R.C. 4112.01(A)(2). An employee is "an individual employed by any employer but does not include any individual employed in the domestic service of any person." R.C. 4112.01(A)(3).

{¶ 272} Burton has not argued that McDonald failed to prove that he was an employer for purposes of the statute. See footnote 4, above. Assuming that McDonald proved that Burton was an employer for purposes of R.C. Chapter 4112, "[w[hether someone is an employee or an independent contractor is ordinarily an issue to be decided by the trier of fact. The key factual determination is who had the right to control the manner or means of doing the work." *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146.[7]

---

[7] The United States Sixth Circuit Court of Appeals also applies the common law agency test to decide in Title VII actions if an individual is an independent contractor or an employee. *Shah v. Deaconess Hosp.* (C.A.6, 2004), 355 F.3d 496, 499. In turn, Ohio generally applies federal case law interpreting Title VII to claims brought under R.C. Chapter 4112. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.* (1981), 66 Ohio St.2d 192, 196.

{¶ 273} "The determination of who has the right to control must be made by examining the individual facts of each case. The factors to be considered include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." Id. (Citations omitted.)

{¶ 274} The facts in the case before us are not clear-cut, and differ from many situations that portray an individual's status more clearly as either an "employee" or an "independent contractor." From the facts, which are somewhat sparse, it appears that Burton did control the details and quality of the work, as well as the hours and tools, which tend to prove that McDonald was an employee. On the other hand, it is clear that Burton was not engaged in a business where he had consistent, ongoing employees. Instead, he made most repairs and did most of the work himself on the apartments, and paid people for sporadic labor when he was too busy to perform certain tasks. The fact that Burton paid in cash, did not have any type of application process, did not provide benefits of any kind, and did not issue W-2 forms, also weighs in favor of an independent contractor status. Since the facts must be construed in McDonald's favor for purposes of ruling on a judgment notwithstanding the verdict, we cannot say that the trial court erred in overruling the motion with respect to McDonald's employment discrimination claim.

{¶ 275} Third Assignment of Error is sustained in that the trial court erred in failing to render judgment notwithstanding the verdict with respect to McDonald's quid-pro-quo housing harassment claim, and is otherwise overruled.

V.

**{¶ 276}** Burton's Fourth Assignment of Error is as follows:

**{¶ 277}** "THE TRIAL COURT ERRED BY GRANTING PARTIAL SUMMARY JUDGMENT TO PLAINTIFFS-APPELLEES AS TO DEFENDANT-APPELLANT'S COUNTERCLAIMS AND THIRD-PARTY CLAIM FOR VIOLATION OF R.C. 2933.52."

**{¶ 278}** Under this assignment of error, Burton contends that the trial court erred in granting summary judgment on his counterclaim and third-party claim for violation of R.C. 2933.52. According to Burton, there are genuine issues of fact concerning whether McDonald and Curry recorded Burton's conversations for purposes of committing an injurious act.

**{¶ 279}** "We review decisions granting summary judgment de novo, which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 133, 2007-Ohio-2722, ¶16. (Citations omitted.) The standard for the trial court is that:

**{¶ 280}** "A trial court may grant a moving party summary judgment pursuant to Civ. R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks* (1999), 134 Ohio App.3d 754, 760. (Citation omitted.)

**{¶ 281}** R.C. 2933.52(A) prohibits interception of wire, oral, or electronic communications. An exception exists, pursuant to R.C. 2933.52(B)(4), which states that R.C.

2933.52 does not apply to:

{¶ 282} "A person who is not a law enforcement officer and who intercepts a wire, oral, or electronic communication, if the person is a party to the communication or if one of the parties to the communication has given the person prior consent to the interception, and if the communication is not intercepted for the purpose of committing a criminal offense or tortious act in violation of the laws or Constitution of the United States or this state or for the purpose of committing any other injurious act * * *."

{¶ 283} The trial court concluded that McDonald's actions (and, therefore, Curry's actions in urging her to tape Burton) were not illegal, because McDonald was a party to the communication. Other courts have agreed that the statute does not apply when the person intercepting the communication is a party. See, e.g., *Georgalis v. Ohio Turnpike Comm.*, Cuyahoga App. No. 94478, 2010-Ohio-4898, at ¶33. However, this does not end the analysis, because the statute sets out a two-prong test. In addition to being a party, the interception must not have been done for purposes of committing a criminal act, tortious act, or other injurious act.

{¶ 284} Burton contends that inclusion of "any other injurious act" means that the legislature did not intend to require that the recording be made for the purpose of committing a crime or a tort, but intended to include any injurious act like publicly embarrassing the other party. Burton argues that McDonald recorded the conversation not only to commit torts, but also to publicly embarrass him. In this regard, Burton points to McDonald's testimony that she recorded the conversation so that other people could see what had happened.

{¶ 285} R.C. 2933.52(B)(4) does not define "injurious act." Burton refers us to

*Boddie v. American Broadcasting Companies, Inc.* (C.A. 6. 1984), 731 F.2d 333, which considered the meaning of a similarly-worded provision in the Federal Wiretap Act. *Boddie*, in turn, relies on an earlier case, *Meredith v. Gavin* (C.A. 8, 1971), 446 F.2d 794. See 731 F.2d at 337-38.

{¶ 286} In *Meredith*, the defendants – an insurer and its claims manager – recorded an interview with the plaintiff without the plaintiff's knowledge. The insurer later used the recording against the plaintiff during a worker's compensation hearing in an attempt to prove that the plaintiff had no compensable injury. 446 F.2d at 796. Subsequently, the plaintiff filed a complaint against the claims manager and insurer, based on Section 2510 et. seq., Title 18, U.S. Code (the Federal Wiretap Act). A jury returned a verdict of no liability. Id. In considering the plaintiff's claim that the trial court should have granted a directed verdict in his favor on liability, the United States Eighth Circuit Court of Appeals considered the legislative history of the federal law. The court noted that there was no contention that the conversation was recorded for a criminal or tortious purpose; the claim was that it was recorded for purposes of committing "any injurious act."

{¶ 287} In considering the meaning of this phrase, the Eighth Circuit Court of Appeals noted that the statute, as originally proposed, had contained a blanket exemption for interceptions where one party to the conversation had consented. Id. at 797-98. Senator Hart objected, because the exemption was " 'totally permissive with respect to surreptitious monitoring of a conversation by a party to the conversation, even though the monitoring may be for insidious purposes such as blackmail, stealing business secrets, or other criminal or tortious acts in violation of Federal or State laws.' " Id. at 798, quoting from 2 U.S. Code

Cong. & Admin. News, 90th Cong., 2d Sess. 2236 (1968). Accordingly, the statute was amended to include within its prohibitions "any interception, use or disclosure of oral or wire communications with the consent of one of the parties where the purpose is to commit any criminal, tortious, or injurious act." Id.

{¶ 288} The Eighth Circuit Court of Appeals rejected the plaintiff's contention that recording a conversation for purposes of impeachment during a worker's compensation proceeding was an "injurious act." Id. The court observed that:

{¶ 289} "There was little if any discussion in Congress on the meaning of the term 'injurious act' within the framework of the reference to the prohibition against nonconsensual wiretaps or recordings by a participant in the conversation. Some vague reference was made to a use that would cause public embarrassment. * * *

{¶ 290} "A perfectly legitimate act may often be injurious. A judgment at law can be injurious to the losing party. A bankruptcy case can injure creditors with scant resources. The resistance to unsupported claims could be injurious to the claimant. But all parties have a right to proceed under the law and to protect their own rights. The term is extremely vague and broad and certainly Congress could not have intended to use the term in its literal context.

{¶ 291} "We do not believe that Congress intended to include within the scope of an 'injurious act' the kind of conduct in question here. It does seem that by using the term 'injurious act' in conjunction with 'criminal and tortious acts', it was intended to reach certain kinds of harmful conduct which might not strictly be criminal or tortious. The scope of such harmful conduct must be determined on a case-by-case basis. However, it seems apparent from the context in which the statute was enacted that the sort of conduct contemplated was an

interception by a party to a conversation with an intent to use that interception against the non-consenting party in some harmful way and in a manner in which the offending party had no right to proceed.

{¶ 292} "In the instant case, the proof in the record is more than adequate to support the jury verdict that the interception in question was not for such a purpose. Even were we to concede that the purpose of the recording was to use it for impeachment purposes, a fact which is by no means necessarily inferred from the record, this would not appear to be a violation of the Act. This use would have been to protect the defendants' position, not to positively harm the plaintiff. Surely it could not be contended that the plaintiff was free to make one statement to the defendant Gavin over the phone, and then to make an entirely different one in the compensation proceedings, without fear of contradiction. The defendant Gavin was clearly competent to testify to the contents of the phone conversation, and we think that preserving the contents of the conversation on the recording in the circumstances of this case was not the sort of 'injurious act' which the statute condemns." Id. at 798-99. (Footnote omitted.)

{¶ 293} These conclusions are equally applicable to the situation before us. The evidence indicates that McDonald recorded the conversation with Burton in an effort to substantiate her claim that he had made offensive comments. When she chose that option, she had already consulted the police and had been told that they would do nothing, since it was a "he said/she said" situation. Under the circumstances, there is no evidence that McDonald acted in violation of the statute by recording Burton, or that Curry acted improperly in

advising her to do so.[8]   To the contrary, McDonald used the recording merely to develop proof for a cause of action to vindicate her rights.

{¶ 294} Accordingly, Burton's Fourth Assignment of Error is overruled.

V

{¶ 295} Burton's Fifth Assignment of Error is as follows:

{¶ 296} "THE PUNITIVE DAMAGES AWARD IN THIS CASE VIOLATES THE OHIO CONSTITUTION, THE UNITED STATES CONSTITUTION AND THE STATUTORY PROVISIONS UNDER TORT REFORM, S.B. 80 AND R.C. 2315.21."

{¶ 297} Under this assignment of error, Burton contends that the punitive damages award violates R.C. 2315.21 and the constitutional limitations on which is it based, because the award constitutes more than ten percent of Burton's net worth at the time the tort was allegedly committed.   Because we are reversing the judgment and remanding this cause for a new trial, we need not consider this assignment of error.   On remand, the issue of an award of punitive damages can be argued and considered based upon the evidence in the record at that time, including any evidence pertaining to Burton's net worth.

{¶ 298} Burton's Fifth Assignment of Error is overruled, as moot.

VI

{¶ 299} Burton's First Assignment of Error is as follows:

---

[8] The federal Wiretap Act was amended in 1986, and no longer contains the term "any injurious act."   See, e.g., *Caro v. Weintraub* (C.A. 2, 2010), 618 F.3d 94, 98, and *Boddie v. American Broadcasting Companies, Inc.* (C.A. 6, 1989), 881 F.2d 267, 268.   This fact is irrelevant for purposes of our analysis, since *Meredith* interprets language identical to that in R.C. 2933.52(B)(4), and was decided before the amendment. In the context of a media/First Amendment situation, the Sixth Circuit Court of Appeals did conclude in *Boddie II* that the phrase "any injurious purpose" could not satisfy the "void-for-vagueness" doctrine, because "[t]he statute's amorphous 'injurious purpose' standard fails to define precisely what interceptions are actionable."   881 F.2d at 271.

{¶ 300} "THE TRIAL COURT ERRED BY SUBMITTING A SPECIAL VERDICT FORM TO THE JURY AS OPPOSED TO A GENERAL VERDICT FORM, IN VIOLATION OF CIV. R. 49."

{¶ 301} Under this assignment of error, Burton contends that the verdict form did not comply with Civ. R. 49, because it omits a space requiring the jury to state the total award for each plaintiff. Burton, therefore, maintains that the verdict is a "special verdict," not a general verdict. Burton also contends that it is unclear whether the jury intended to award McDonald three separate $50,000 awards, for a total of $150,000, or whether the jury intended only to award her $50,000. In response, plaintiffs argue that the verdict used is a "general" verdict, not a special verdict, because it requires the jury to find in favor of either the plaintiffs or the defendants. Plaintiffs also contend that Burton invited the error, because his counsel approved the verdict forms and only had a change of heart after the court had read the instructions and explained the verdict forms to the jury.

{¶ 302} We conclude that this assignment of error is moot, because the judgment for plaintiffs is being reversed and this cause is being remanded for a new trial. On retrial, the parties are free to submit whatever verdict forms they feel are appropriate.

{¶ 303} Burton's First Assignment of Error is overruled, as moot.

VII

{¶ 304} Burton's Second Assignment of Error having been sustained, his Third Assignment of Error having been sustained in part and overruled in part, his Fourth Assignment of Error having been overruled, and his First and Fifth Assignments of Error having been overruled as moot, the judgment of the trial court is Reversed, and this cause is

Remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

GRADY, P.J., and RINGLAND, J., concur.

(Hon. Robert P. Ringland, Twelfth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.)

Copies mailed to:

Andrew L. Margolius
Margolius, Margolius & Associates
55 Public Square, Suite 1100
Cleveland, Ohio 44113

Mike Dewine, Attorney General of Ohio
Duffy Jamieson,
Carolyn E. Gutowski,
30 East Broad Street, 15th Floor
Columbus, Ohio 43215-3428

Dwight D. Brannon
Matthew C. Schultz
Brannon & Associates
130 West Second Street, Suite 900
Dayton, Ohio 45402

Hon. Connie S. Price
Montgomery Co. Common Pleas Court
41 N. Perry Street
Dayton, OH 45422